807 A.2d 789

**In re ADOPTION/GUARDIANSHIP OF MARK M.**

**No. 1832, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 13, 2002.

100

Martha Weisheit, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

C.J. Messerschmidt, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Nancy C. Hopkins, Assistant Attorney General, on the brief); William Riddle of Elkton, on the brief for appellee Mark M.

Argued before HOLLANDER, SHARER, THIEME, RAYMOND G., JR. (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

This case involves a mother's second appeal from a juvenile court's refusal to grant her request for a psychological examination of her child by an expert of her choice before terminating her parental rights. On this appeal, she presents the following two questions:

I. Did the juvenile court abuse its discretion by refusing to vacate the order terminating the mother's parental rights, where the Court of Appeals had ordered further proceedings in a related case from which an appeal was pending at the time the order terminating parental rights was entered?

II. Did the juvenile court abuse its discretion by determining that the child would be harmed by the psychological examination proposed by the mother, and that the harm outweighed the mother's need for the examination?

We answer the second question in the affirmative. We need not and shall not address the first question.

## PROLOGUE

Ms. Helen M., the appellant, is the natural mother of Mark M., who was born on March 5, 1994, and who was adjudicated a child in need of assistance ("CINA") on April 9, 1995, by the District Court of Maryland, Montgomery County, sitting as the juvenile court.

On June 17, 1999, the Montgomery County Department of Health and Human Services ("the Department") filed a "Petition for Guardianship with Right to Consent to Adoption or Long Term Care Short of Adoption." The Department recommended that Mark M. be adopted by his paternal grandmother, Peggy M., with whom he had been residing since June of 1998. On February 24, 2000, in connection with the Department's petition, Helen M. filed a "Motion for Evaluation of

Child." A hearing was held on the motion on March 29, 2000, and the motion was denied.

A six-day hearing on the "Petition for Guardianship with Right to Consent to Adoption" commenced on April 26, 2000 and the appellant appealed the final order that terminated the appellant's parent rights and granted the Department's Petition, and on June 13, 2000, the juvenile court granted the petition and terminated Helen M.'s parental rights.

## ACT ONE

In her first appeal to this Court, Helen M. argued that it was a denial of due process to refuse her request for an examination of the child by her own expert.[1] This Court neither reversed nor affirmed on this issue, but instead remanded the case for further proceedings, "in order for the court fully to consider and determine whether such an evaluation would be harmful to Mark, and whether appellant is entitled to the requested evaluation." *In Re: Adoption/Guardianship No. 6Z99027*, No. 884, September Term, 2000 (filed March 9, 2001) at 34.

At the time of the remand by this Court, an appeal was pending in the Court of Appeals from a related CINA proceeding involving visitation. In that proceeding, the juvenile court had refused a similar request by Helen M. for a psychological examination of Mark and had denied Helen M. visitation with her son. In light of the pending appeal from the CINA proceeding, Helen M. filed a motion in this Court to stay further proceedings in the juvenile court in this termination of parental rights ("TPR") action. This Court denied the motion.

---

1. Mark M. did not submit a brief in the first appeal but his counsel informed this Court that Mark M. adopted the Department's position. *See In Re: Adoption/Guardianship No. 6Z990027*, No. 884, September Term, 2000 (filed March 9, 2001) at 1 n. 1. Mark M. has not submitted a brief in this second appeal.

## ACT TWO

On July 13, 2001, in accordance with the mandate from this Court, the juvenile court held a hearing to determine whether the forensic mental examination of Mark sought by Helen M. would be harmful to him, and whether Helen M. was entitled to such an examination before her parental rights could be terminated. Dr. John Mealy, the clinical psychologist that Helen M. proposed to conduct the examination, testified that the purpose of the examination would be to determine "to what extent [Mark's fear of Helen M. is] a reality based perception." Dr. Mealy had reviewed the records in this case and had also listened to testimony elicited during previous proceedings in this case from Dr. Robert Lazun, Mark's therapist, and Dr. Joseph Poirier, a clinical psychologist who had evaluated Helen M. and her family for the Department in 1995. Dr. Mealy noted that reports of abuse conflicted with reports that Mark was well-treated by his mother, so that it was difficult to determine the quality of that relationship. Furthermore, because the attachment with his mother had been abruptly terminated with no visitation, the child had been subjected to a potentially traumatic experience.

Dr. Mealy testified that, because of these complicated issues, an in-depth examination would be necessary, which would include watching Mark interact with his grandmother, teachers, or any other caretakers. In Dr. Mealy's opinion, it would also be important to conduct psychological testing so that he could "try and get a sense of what [Mark's] experience is, what he thinks about, what his personality, characteristic strengths, weaknesses, what kind of thinking goes on, how his emotion is handled." One of his goals would be to determine the extent to which Mark's perception of his mother was based on reality, and he suggested that an evaluation of the mother could also be important in that process. He stated that in his experience children would sometimes describe their parents as horrible people, and yet when they were together in the same room with them, they would appear to have a good relationship. Dr. Mealy added that he could not envision any harm to the child from such an evaluation, and he had "no sense that

I've ever traumatized a child that way." In his experience, children responded favorably to his treatment of them.

When questioned as to whether he had to talk to Mark about his mother, Dr. Mealy testified that if any discussion with Mark about his mother was too distressing for him, he would not pursue it. If Mark handled those discussions well, however, he might even entertain the possibility of a visit with his mother so that he could observe them together. According to Dr. Mealy, the important thing would be that the evaluation be "done in a sensitive way, to him." Dr. Mealy testified:

> Perhaps there should be some visitation with his mother, that I could observe, you know. I mean, that's, in terms of a full evaluation, that's out on the edge of it. It's not something that I would say that I wouldn't, that I'm going to do, but it's something that could be sensible, as an evaluation progresses. . . .

Dr. Mealy estimated that it would require approximately 20 hours to perform the type of thorough evaluation that was needed in this case.

Although he had never met Mark, Dr. Mealy believed that the examination could be conducted without causing him any additional trauma. When questioned on cross-examination as to whether he had any opinion on whether the process would be harmful to Mark, Dr. Mealy responded that the evaluation would be conducted in a way that was safe and comfortable for Mark, and that he would not pursue avenues of inquiry that were having an adverse effect on him. Dr. Mealy acknowledged that he had no basis for determining whether Mark's reaction to the mere mention of his mother was based on reality or not, but he felt it was important to the child's welfare to find out whether those fears were based in reality.

Dr. Mealy acknowledged that the guiding principle in this process was first to "do no harm." He added that, if the court was uncomfortable with the possibility that the child might be traumatized by the evaluation, he could provide the court with

an interim report which would cover: the tests he had given up to that time; his findings; and his recommendations.

Dr. Robert Lazun, a licensed clinical social worker who had been Mark's therapist since July of 1998, testified as an expert witness for the Department. Dr. Lazun expressed his belief that the proposed examination *would* be harmful to Mark. According to Dr. Lazun, Mark was doing very well in the care of his grandmother and was developing a sense of trust in his caretakers and teachers. He and Mark have been working on building relationships of trust among Mark and those with whom he interacts. Mark, however, is suspicious of anything that he associates with his mother. Dr. Lazun stated, "Mark reacts when he hears anything about, anything which reminds him, or makes him think of, the fact that he would have to have something to do with his mom." Dr. Lazun was confident that having to go through an additional evaluation would send up a "red flag" for Mark, and that "Mark would automatically assume that it has to do with his mother." Dr. Lazun concluded that Mark "would immediately begin to question the trust that he has in his grandmother and other people," would "slip back, very far," and that "he would believe that there isn't really anyone he can trust." Dr. Lazun added that the consequences of the examination proposed by Dr. Mealy would be "catastrophic."

According to Dr. Lazun, Mark was doing very well in the care of his grandmother and was developing a sense of trust in his caretakers and teachers. In his opinion, any kind of evaluation would be harmful to Mark at this time because he would sense a connection between the evaluation and his past life, which causes him a great deal of anxiety. According to Dr. Lazun, Mark would sometimes express his anxiety by twisting and pulling out his hair and spitting. Also, Mark would become irritable and demanding with his grandmother.

In Dr. Lazun's opinion, Mark would be resistant to any testing procedures, and as a result they would probably not produce an accurate reading. Furthermore, the tests might cause him to distrust others and become disruptive at school and at home. When asked about the possible impact of a

meeting with his mother, Dr. Lazun stated that he was "speechless" and unable to imagine the impact. He further testified, however, that he had occasionally raised the subject of Mark's mother with him over the past six months, and Mark no longer clenched his fists when she was mentioned. Instead, Mark stated in a very matter of fact way that he didn't want to talk about it. Although Dr. Lazun stated that in his opinion Mark would be upset and lose his sense of trust in the world if psychological tests were administered to him, Dr. Lazun admitted that he was a clinical social worker, not a psychologist, and that he was not trained in the use and interpretation of psychological tests.

When Dr. Mealy was called to testify in rebuttal, he stated that any perception by Mark of the evaluation as a threatening event would be a distortion of reality and would have "little to do with the reality of the psychological evaluation as I would conduct it." Dr. Mealy further testified that if Mark's therapist were to advise him that any reference to the mother would produce a "catastrophic" emotional reaction in Mark, "then I wouldn't do it, unless I gained independent confidence that it was possible by the child."

After hearing this additional evidence, the juvenile court "reaffirmed" its termination of Helen M.'s parental rights. The court issued an order stating in pertinent part:

> [T]he court finds by clear and convincing evidence that the evaluation requested would be harmful to the child, Mark M., and would not be in his best interest. In balancing the need to protect Mark M. from further harm with the mother's assertion of good cause for the evaluation, the Court finds that the risk of harm to Mark M. far outweighs the mother's need for the evaluation.

Helen M. has again appealed to this Court

## COMMENTARY

In resolving Helen M.'s appeal in the related CINA proceeding, the Court of Appeals observed that "[a] parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court...." *In Re*

*Mark M.,* 365 Md. 687, 705, 782 A.2d 332 (2001) (citing *Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). The Court added that "Maryland, too, has declared a parent's interest in raising a child to be so fundamental that it 'cannot be taken away unless clearly justified.'" *In Re Mark M.,* 365 Md. at 705, 782 A.2d 332 (citing *Boswell v. Boswell,* 352 Md. 204, 218, 721 A.2d 662 (1998)).

As the Court of Appeals explained:

That fundamental interest, however, is not absolute and does not exclude other important considerations. Pursuant to the doctrine of *parens patriae,* the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. . . . We have held that "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." . . . That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent. . . . [T]he child's welfare is "a consideration that is of 'transcendent importance'" when the child might otherwise be in jeopardy. . . .

*In Re Mark M.,* 365 Md. at 705–06, 782 A.2d 332 (citations omitted). *See also In Re Adoption/Guardianship No. T00032005,* 141 Md.App. 570, 580–82, 786 A.2d 64 (2001). The Court of Appeals further recognized in the related case that "in cases where abuse or neglect is evidenced, particularly in a CINA case, the court's role is necessarily more pro-active." *In Re Mark M.,* 365 Md. at 706, 782 A.2d 332.

At the relevant time, former § 3–818 of the Courts Article controlled psychological examinations of children in CINA and TPR cases.[2] *See* Md.Code (1974, 1998 Repl.Vol.), § 3–818 of

---

**2.** By 2001 Laws of Maryland, ch. 415, § 3, effective October 1, 2001, § 3–818 was redesignated, in substantive part, as § 3–816. *See* Md.

the Cts. & Jud. Proc. Art. *See also id.,* former § 3–804(a)[3] (providing that juvenile court has jurisdiction in CINA proceedings and proceedings for termination of parental rights where child has been determined to be in need of assistance). Former § 3–818 provided in pertinent part:

> (a) *In general.*— After a petition or a citation has been filed, the court may direct the Department of Juvenile Justice or another qualified agency to make a study concerning the child, his family, his environment, and other matters relevant to the disposition of the case.
>
> (b) *Examination by professionally qualified person.*— As part of the study, the child or any parent, guardian, or custodian may be examined at a suitable place by a physician, psychiatrist, psychologist, or other professionally qualified person.
>
> . . .

*Id.,* former § 3–818.

In *In Re Mark M.,* 365 Md. at 717, 782 A.2d 332, the Court of Appeals held that

> motions for independent [psychological] examinations may be made by a parent or other party in a CINA proceeding, in addition to the state. We also hold that when making a motion to compel a physical or mental examination of a child pursuant to Section 3–818 of the Courts and Judicial Proceedings Article, the party making the motion must demonstrate good cause for such an examination. The examination should be reasonably calculated to assist the trier of fact in rendering its decision. . . .
>
> The party also must show that the proposed examination will not be harmful to the child. . . .

(Citations omitted.) In the appeal from the related CINA proceeding, the Court of Appeals determined that Helen M.

---

Code (1974, 1998 Repl.Vol., 2001 Cum.Supp.), § 3–816 of the Cts. & Jud. Proc. Art.; Revisors note to *id.,* § 3–801.

**3.** Former § 3–804 of the Courts Article was redesignated as § 3–803 by 2001 Laws of Maryland, ch. 415, § 3.

had "failed to make a proper showing of a need for an independent ... examination of Mark M." and "did not provide any means to assure that such an examination would not be harmful to Mark M." *Id.* at 719, 782 A.2d 332. The Court relied on a different ground—the juvenile court's improper delegation to Mark's therapist of its authority to determine visitation—in reversing the juvenile court's denial of visitation to Helen M. The Court nevertheless commented:

> Upon remand, Helen M. should have the opportunity to advocate for an independent [psychological] examination if she so chooses, but must provide the data specified, and the court must balance the protection of Mark M. against Helen M.'s need for the examination. The juvenile court must be specific in its decision to either grant or deny the motion for an independent [psychological] examination of the child.

*Id.*

■ The Court's holding regarding independent psychological examinations in CINA proceedings is equally applicable to TPR proceedings. A parent against whom a petition for termination of parental rights has been filed may move for an independent examination, and must then demonstrate that there is good cause for the proposed examination and that the examination will not be harmful to the child. *See id.* at 717–18, 782 A.2d 332.

■ Upon Helen M.'s first appeal from the juvenile court's termination of her parental rights, this Court suggested that there was merit in Helen M.'s assertion that there was good cause for the examination. We stated: "In a case of this magnitude, we are hard pressed to articulate any reason to deny the mother a full and fair opportunity to establish the child's emotional ties to her, or to challenge the testimony of the Department's key expert." *In Re: Adoption/Guardianship No. 6Z99027,* No. 884 at 33. We recounted the evidence presented at the TPR hearing and concluded, moreover, that there was an "absence of evidence that Mark would have been harmed by an evaluation conducted by the mother's expert...." *Id.* We observed that, in terminating Helen M.'s

parental rights, the juvenile court had erroneously asserted that "issues such as the child's attachment to his mother are not 'under the purview of the termination of parental rights'...." *Id.* We pointed out that, under § 5–313(c)(iii) of the Family Law Article, a court is required to consider, *inter alia,* "the child's feelings toward and emotional ties with the child's natural parents" before it may terminate parental rights and permit adoption without the natural parents' consent. *Id.* at 32. We thus remanded the case to the juvenile court, without affirmance or reversal, with instructions to reconsider whether Helen M. was entitled to the examination and whether it would be harmful to Mark. *Id.* at 34.

As we have indicated, the juvenile court *did* hear additional testimony from both Dr. Mealy and Dr. Lazun. The court then concluded:

> ... Based on the testimony and the demeanor and credibility of the witnesses that appeared in front of me, on the hearing on ... remand, I have determined that such an evaluation would be very detrimental to Mark, and I will not order it. I have to determine whether the appellant is entitled to the requested evaluation.... There has to be good cause and ... evidence to support ... the mother's request for the evaluation.

> Now, as I re-read the testimony and the ... opinions, in this case, the reason the mother requested this, was mainly to support a theory that she had, of alienation of affections. And I find that based on all the evidence that I heard, there is absolutely nothing to support that theory. To the contrary, all the evidence is to the contrary of that.

> So, in balancing the mother's need against the need to protect the child, his best interest ..., I find that ... the mother has not met her burden in any way.... [A]ll there has been is a flat assertion, of the possibility of this, ... there's been no evidence to support it. And as a matter of fact, all the evidence that was presented was totally contrary to that.

So, I find that the balance is in favor of Mark and the protection of Mark, and so I will not order the evaluation.

■ We review a juvenile court's denial of a request for a psychological examination under former § 3–818 of the Courts Article to determine whether the court abused its discretion. *See, e.g., In Re Mark M.*, 365 Md. at 719, 782 A.2d 332. We are persuaded that there was an abuse of discretion in the instant case.

As we indicated in response to Helen M.'s first appeal, Helen M. was faced with the loss of a fundamental right—the right to raise her child. The Department's key witness was Mark's therapist, Dr. Lazun. Dr. Lazun was a licensed clinical social worker who had been hired by Mark's grandmother, the woman with whom Mark resided and who hoped to adopt Mark upon the termination of Helen M.'s parental rights. Dr. Lazun was expected to—and ultimately did—testify to the effect that it was in Mark's best interest that Helen M.'s parental rights be terminated and the adoption proceed. Absent a psychological examination by another mental health professional, Helen M. would have no effective way to refute Dr. Lazun's testimony. Significantly, as we indicated in our opinion resolving the first appeal, Helen M. presented evidence at the initial TPR hearing to the effect that she was a caring and effective parent who had met with some success in overcoming her own mental health and substance abuse problems. *See In Re: Adoption/Guardianship No. 6Z99027*, No. 884 at 6–7. There was thus an evidentiary basis for Helen M.'s contention that there was a strong bond between Mark and herself. The juvenile court's determination that Helen M. had failed to establish good cause for the proposed examination was simply incorrect.

Nor can we accept the juvenile court's determination that, under any circumstances, "an evaluation would be very detrimental to Mark. . . ." While Dr. Lazun stated that the mere mention of Helen M. to Mark would set Mark's therapy back and create trust issues, he indicated that he himself tested the waters periodically by asking Mark if he wanted to talk about

his mother. Although in the past Mark was visibly upset by this question, he now simply responded that he did not. Dr. Lazun's position that *any* evaluation of Mark would be "catastrophic" to Mark if conducted by anyone other than himself is untenable; it would hobble Helen M.'s defense by ensuring that the Department's position was the *only* position that could be supported by informed expert testimony. Dr. Lazun admitted, moreover, that he, unlike Dr. Mealy, is not a psychologist and is not trained in the use and interpretation of psychological testing.

## EPILOGUE

We acknowledge that Mark M.'s emotional health may be precarious, and that any examiner must be sensitive to Mark's insecurities and tender age, as well as to the concerns of Mark's therapist. We do not, however, accept the proposition that an examination simply cannot be conducted. We are confident that Dr. Mealy, a trained clinical psychologist with more than 30 years of experience in conducting psychological examinations of children, will be able to conduct the examination in a manner that is not harmful to Mark.

**JUDGMENT OF THE DISTRICT COURT OF MARYLAND, MONTGOMERY COUNTY, JUVENILE DIVISION VACATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**APPELLEE TO PAY THE COSTS.**