869 A.2d 370

**In re SAMONE H. & Marchay E.**

**No. 30, Sept. Term, 2004.**

Court of Appeals of Maryland.

Feb. 9, 2005.

Reconsideration Denied April 1, 2005.

284

Claudia A. Cortese, Asst. Public Defender (Nancy S. For-ster, Public Defender, on brief), for petitioner.

Rhonda Cooper, Legal Aid Bureau, Inc., C.J. Messer-schmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

In this action between the biological mother and the State, we have been asked to consider whether the trial court properly denied a motion for independent evaluation of the "bonding" of Katina M. with her biological children, Marchay E. and Samone H., who had been declared children in need of assistance, pursuant to Maryland Code (1974, 2002 Repl.Vol.), § 3–816 of the Courts and Judicial Proceedings Article, during a permanency plan review hearing. At issue also is whether the trial court properly quashed subpoenas for the children to testify during the review hearing or *in camera.*

## I. Facts and Procedural History

Samone H., born on July 20, 1996, and Marchay E., born on January 19, 1991, are the children of Katina M. On September 24, 1996, after investigating allegations of neglect regarding Samone H., the Baltimore City Department of Social Services (BCDSS) filed a petition in the Circuit Court for Baltimore City, Division of Juvenile Causes, requesting that Samone H. be removed from Katina M.'s care and declared a child in need of assistance (CINA)[1] because the BCDSS claimed, among other allegations, that Katina M. had a history of drug abuse and had failed to provide adequate care for Samone H. The court conducted an emergency shelter care hearing[2] and ordered "BCDSS to provide care and custody for [Samone] in shelter care, pending [an adjudicatory] hearing."[3] On February 18, 1997, the Circuit Court ordered Samone H. to be placed with a relative who BCDSS identified as her great-grandmother. Subsequently during the adjudicatory hearing Samone H. was declared a CINA by the Circuit Court but returned to Katina M. under an Order of Protective Supervi-

---

1. Md.Code (1973, 2002 Repl.Vol.), § 3–801(f) of the Courts and Judicial Proceedings Article defines a CINA as:

> "Child in need of assistance" means a child who requires court intervention because:
> (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
> (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

2. Shelter care "means a temporary placement of a child outside of the home at any time before disposition." Md.Code (1973, 2002 Repl.Vol.), § 3–801(w) of the Courts and Judicial Proceedings Article. A shelter care hearing "means a hearing held before disposition to determine whether the temporary placement of the child outside of the home is warranted." Md.Code (1973, 2002 Repl.Vol.), § 3–801(x) of the Courts and Judicial Proceedings Article.

3. An adjudicatory hearing is "a hearing under this subtitle [Juvenile Causes] to determine whether the allegations in the petition, other than the allegation that the child requires the court's intervention, are true." Md.Code (1973, 2002 Repl.Vol.), § 3–801(c) of the Courts and Judicial Proceedings Article.

sion by BCDSS.[4]

Six weeks after the Baltimore City Police had responded to a call to the great-grandmother's residence because Katina M. had locked Samone H., Marchay E., and the great-grandmother in the house, BCDSS took custody of Samone H. and Marchay E. Thereafter, BCDSS petitioned to remove the children from the care of Katina M. and also to declare Marchay E. a CINA. After an emergency hearing, the Circuit Court ordered that both children be committed to the custody of BCDSS and placed in the care of the great-grandmother.

Within a month, on July 18, 1997, BCDSS requested that the Circuit Court remove the children from the great-grandmother's care and commit them to the custody of BCDSS with placement in the foster home where they currently reside. On January 27, 1998, the Circuit Court conducted an adjudicatory hearing, determined Marchay E. to be a CINA and ordered both Samone H. and Marchay E. to remain in the custody of BCDSS. The court also established a permanency plan[5] to

---

4. The Order also specified that Katina M. participate in an outpatient substance abuse program, reside with the great-grandmother, ensure that Samone H.'s health needs were met and attend parenting training. The Circuit Court further ordered that BCDSS would be allowed to remove Samone H. from Katina M.'s care if necessary.

5. Md.Code (1984, 1999 Repl.Vol.), § 5–525(e) of the Family Law Article states:

 *Development of a permanency plan.*—(1) In developing a permanency plan for a child in an out-of-home placement, the local department of social services shall give primary consideration to the best interests of the child. The local department shall consider the following factors in determining the permanency plan that is in the best interests of the child:
 (i) the child's ability to be safe and healthy in the home of the child's parent;
 (ii) the child's attachment and emotional ties to the child's natural parents and siblings;
 (iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;
 (iv) the length of time the child has resided with the current caregiver;
 (v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

have both children live with relatives capable of caring for them. During this time, Katina M. was allowed one supervised visit per month with each of the children.

Thereafter, the Circuit Court conducted periodic review hearings [6] and on June 24, 1999, the court revised the permanency plan to a concurrent permanency plan of adoption or placement with a relative. The Circuit Court again changed

---

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.
In addition, Md.Code (1973, 2002 Repl.Vol.), § 3–823(e) of the Courts and Judicial Proceedings Article states:
*Determinations to be made at hearing.*—At a permanency planning hearing, the court shall:
(1) Determine the child's permanency plan, which may be:
(i) Reunification with the parent or guardian;
(ii) Placement with a relative for:
1. Adoption; or
2. Custody and guardianship;
(iii) Adoption by a nonrelative;
(iv) Guardianship by a nonrelative;
(v) Continuation in a specified placement on a permanent basis because of the child's special needs or circumstances;
(vi) Continuation in placement for a specified period because of the child's special needs or circumstances; or
(vii) Independent living; and
(2) For a child who has attained the age of 16, determine the services needed to assist the child to make the transition from placement to independent living.
These same provisions of the Maryland Code were in place throughout the pending proceedings.
6. Md.Code (1973, 2002 Repl.Vol.), § 3–823(h) of the Courts and Judicial Proceedings Article states:
*Periodic reviews.*—(1)(i) Except as provided in subparagraphs (ii) and (iii) of this paragraph, the court shall conduct a hearing to review the permanency plan at least every 6 months until commitment is rescinded.
(ii) The court shall conduct a review hearing every 12 months after the court determines that the child shall be continued in out-of-home placement with a specific caregiver who agrees to care for the child on a permanent basis.
(iii) 1. Unless the court finds good cause, a case shall be terminated after the court grants custody and guardianship of the child to a relative or other individual. 2. If the Court finds good cause not to terminate a case, the court shall conduct a review hearing every 12 months until the case is terminated.

the permanency plan to one of adoption after another review hearing had occurred on December 6, 2000.

Katina M. then filed a motion for reconsideration seeking to change the permanency plan from adoption to reunification. During an annual review hearing held on March 1, 2002, Mary Gilliard, a BCDSS case worker assigned to the case since 1999, testified that Marchay E. and Samone H. should not be removed from their foster home because they were "very bonded" with the foster family. Ms. Gilliard further testified that the visits between Katina M. and the children were "going pretty well" and that the children were glad to see Katina M. When questioned about the detrimental effect of discontinuing the visits, Ms. Gilliard appeared to have differing opinions:

[CHILDREN'S COUNSEL]: There also is some emotional attachment between the children and their biological Mother, that's correct also?

[MS. GILLIARD]: Yes.

[CHILDREN'S COUNSEL]: And it would be detrimental to cut off that relationship between the children and their Mother, is that correct?

[MS. GILLIARD]: Yes, it would at this time.

While in response to questioning by Katina M.'s attorney on the same subject, Ms. Gilliard testified:

[KATINA M.'s COUNSEL]: Okay, do you think the children have an emotional bond with their Mother?

[MS. GILLIARD]: I can't [answer] that question for you right now.

[KATINA M.'s COUNSEL]: Do you think stopping the visits between the children and the Mother would be detrimental to the children?

[MS. GILLIARD]: I don't think so, no no.

[KATINA M.'s COUNSEL]:It would be okay, you don't think they would mind?

[MS. GILLIARD]: Nah, I don't think so at all.

\* \* \*

[KATINA M.'s COUNSEL]: Even though they're loving and caring with their Mother?

[MS. GILLIARD]: For the time that they're with them, they are you know, for that hour, but I don't think it would be detrimental to them if they don't see their biological Mom, because with the foster Mom they have been there so long so this is—

[KATINA M.'s COUNSEL]: Okay, but I'm just talking about as far as the biological Mom and her children and you're saying it would be, there would be no harm done to stop the visits today?

[MS. GILLIARD]: Maybe to the biological Mom, but not to the children, no.

During the March 1, 2002 hearing, Katina M. also testified about her visits with Marchay E. and Samone H:

My visits are great. They don't want to be leaving, they get sad. Like I said, Samone tells me to follow them and Marchay told me that any—I asked Marchay when do she rather see me, the beginning of the month or the end. She said it doesn't really matter just as long as she [sees] me. She just don't want to not see me.

After hearing the testimony, the judge concluded that it would be in the children's best interests to remain in foster care:

[There] is no doubt in mind as to ... what's in the best interest of the children and that's what I'm concerned with. Not the best interest of the Father, not the best interest of the Mother, not in the best interest of the foster parents. It's what's in the best interest of the children. There's no question in this Court's mind that the children have been in foster care for a very, with the same family, for a very substantial time. Most of their lives. One child is only 5, the other child is 11. They have been in foster care since 1997. So, for a good part of their lives, for one almost the whole life and the other for at least half their lives, approximately half. There is no question in the Court's mind that they're bonded to the foster parents. That they consider the foster family as their family. I don't question that the

> Mother has turned herself around, but for many years she hadn't turned herself around and so to disrupt the children, to remove the children from the place where they've lived for a good part of their lives would be detrimental to them and would serve no useful purpose. . . .

At the same time that the court ordered the permanency plan for adoption to continue, the judge also ordered Katina M.'s supervised visits with the children to be increased to one hour two times per month and issued a separate order denying Katina M.'s motion for reconsideration, which she appealed to the Court of Special Appeals.

Thereafter, in an unreported opinion, the Court of Special Appeals affirmed the Circuit Court's ruling and held that the trial judge did not abuse his discretion in denying Katina M.'s request to change the permanency plan. The intermediate appellate court emphasized that the trial judge properly had considered the children's best interests in reviewing the permanency plan based upon the guidelines set forth in Maryland Code, Section 5–525(e) of the Family Law Article, because he had assessed the potential harm to Marchay E. and Samone H. if removed from their current placement; the length of time the children were with their foster family; and any bond the children had with the foster family and their biological mother. As such, the Court of Special Appeals held that there was "sufficient evidence in the record to support the Circuit Court's decision that a permanency plan of adoption [was] in the best interests of Marchay and Samone."

Within one year, on March 13, 2003, the Circuit Court held another review hearing. Prior to the hearing Katina M. filed a motion for independent study seeking to have the children evaluated by a psychiatrist to provide an assessment of her relationship with her children and whether removing the children from foster care would be harmful; she also subpoenaed both Marchay E. and Samone H. to testify. At the hearing, before the judge who had presided at the March 2002 hearing, Katina M. argued that an independent study of her bond with her children would assist the court in determining whether to change the permanency plan:

[KATINA M.'s COUNSEL]: Your Honor, I did file a motion for independent study concerning matters relevant to the case. In that motion, I stated that the Department had in the past alleged that there was not a sufficient bond between the children, respondents, and my clients that they are—that stated that removal of the respondents from the foster parents would be harmful to the respondents.

Obviously, there is a TPR [7] pending to terminate my clients' rights. That the allegations regarding the bonding were made by the worker but not by any clinician, that the only way for the mother to rebut these allegations was to have an independent examination that the foregoing was sufficient good cause to order an examination, and that the examination would be conducted by our expert at a place and time convenient for the respondents, and that would not be harmful to the respondents.

Just to give you a little background, Your Honor, we did have a hearing before you on March 1st, 2002.

\* \* \*

Again, Your Honor, we did not hear from any clinician about any bond. My client would like, and the court should want, an independent evaluation of the bond between the children and the mother because that would assist the court,

---

7. In cases where the permanency plan is changed to adoption, Maryland Code (1973, 2002 Repl.Vol.), § 3–823(g) of the Courts and Judicial Proceedings Article states that the court shall:

(1) Order the local department to file a petition for guardianship in accordance with Title 5, Subtitle 3 of the Family Law Article within 30 days or, if the local department does not support the plan, within 60 days; and

(2) Schedule a TPR hearing instead of the next 6–month review hearing.

Pursuant to Md.Code (1973, 2002 Repl.Vol.), § 3–801(y) of the Courts and Judicial Proceedings Article, a "TPR proceeding" means "a proceeding to terminate parental rights." According to testimony by Ms. Gilliard during the March 1, 2002, hearing, a TPR petition was filed in this case and dismissed in December of 2001; BCDSS then filed a new petition in January of 2002. On November 11, 2004, the trial court entered an order staying the TPR proceedings pending this appeal.

and certainly all parties, in making a decision in this matter. This examination would not cause harm to the children.

This issue had been through the appellate courts before, Your Honor. And *In re Mark M., In re Adoption of Mark M.*, I have those cases if you'd like to take a look at them. If I could get the clerk to hand these up. In those cases, the Department alleged that Mark was in a fragile mental state, and would be harmed by the evaluation. They claimed that the examination would have a catastrophic effect on Mark. In that case, the child had not seen his mother for over a year.

Now, in this case, Your Honor, my client sees these children twice a month. I'm not aware of any allegations that an examination would cause harm or would be, have a catastrophic effect on the children. And even if there were, Your Honor, in *In re Mark M.* and *In re Adoption/Guardianship of Mark M.*, the court ordered that the mother be allowed to conduct an examination anyway. Despite the Department's allegation. And if you look at *In re Adoption/Guardianship*, Your Honor, it's very clear in that matter.

And without a clinical evaluation, there is no way for the mother to rebut the Department's conclusion that there is no bond. The Court of Appeals in *Adoption/Guardianship of Mark M.* found that to deny such an evaluation would mean that Social Services is the only one able to present evidence on bonding. And because of that, because to otherwise not allow a mother's ability to defend her parental and constitutional rights, ordered that she be allowed to conduct an evaluation.

Also in *Mark M.*, Your Honor, the Court of Appeals found that the mother, this is *Adoption Guardianship of Mark M.*, the Court of Appeals found that the mother was a caring parent, had overcome her substance abuse problem, and considering the magnitude of the mother's rights, said an evaluation was appropriate. Here, again, Your Honor, my client has done all those things. She does care for the

children. And it would be appropriate to have an evaluation be done.

I would ask the Court to apply both *In re Mark M.* and *In re Adoption Guardianship of Mark M.*, and order that evaluation be done by the mother's expert. Your Honor, we are offering Brian Zamitsky, who is a psychiatrist who works at the Crownsville Hospital Center. He is responsible for conducting in patient and out patient juvenile forensic psychiatric evaluations for the juvenile court system.

We believe that this examination can be done with no harm to the child. The only harm I've heard alleged so far from child's counsel is that the children would be removed from school for the evaluation. Certainly, we could work-I'm not sure if that rises to the level of harm, but certainly we could work around the children's school schedule in order to accommodate the examination.

(emphasis added).

Both BCDSS and the children's attorney objected to the independent study arguing that an evaluation would be harmful to the children because the psychiatrist would be unfamiliar with the children and might delve into their past. Katina M. countered that the expert's evaluation would be limited to the "bonding issue," without having to probe into the children's past experience with their mother. When the court denied the motion for independent study, the following dialogue occurred:

[KATINA. M.'s COUNSEL]: In rebuttal, Your honor, I do think that there is controversy over whether the children have a bond with their mother or not. And I think that—

[THE COURT]: Well, I don't think there is because—

[KATINA. M.'s COUNSEL]: Well, the other thing, Your Honor

[THE COURT]: Because I heard the worker testify as to viewing the meetings between the children and the mother—

\*　　\*　　\*

—and I was satisfied then and I'm satisfied now that there is very little bond, if any, between, very little bond with the mother. All the bonding is with the foster family, the custodians.

\* \* \*

THE COURT: I am not going to have an independent, in the sense of having some psychologist or psychiatrist say, interview the children. I am not going to put them through that.

[KATINA M.'s COUNSEL]: Your Honor, how can I rebut that, then?

[CHILDREN'S COUNSEL]: It's harmful to the children.

[KATINA M.'s COUNSEL]: How can I rebut it? That is the question. If I can't rebut it, then we're just saying well, the court—

THE COURT: No.

[KATINA M.'s COUNSEL]:—DSS rolls along without me having a say so.

THE COURT: You rebutted it by the mother's description of her relationship with the children.

[KATINA M.'s COUNSEL]: Now you're saying I can't. I mean, how am I going to—I think that's why we need the independent. We've got my client and the Department of Social Services who both clearly have biases in this case. That's why an independent evaluation would be appropriate.

After lengthy argument between the parties, the trial judge stated: "Okay. I am not at this point going to grant an 'independent evaluation' by mom's expert or anybody else's expert. Period. That ends it."

BCDSS thereafter, moved to quash the subpoenas to have Marchay E. and Samone H. testify or, in the alternative, to have the children testify *in camera.* Katina M. objected to having the children testify *in camera* and expressed concern about allowing the judge to question the children in her absence. In response to the motion to quash, the trial judge ruled: "I am not putting young children on the stand. Peri-

od." and stated, "[a]nd I'm not going to do-I'm not going to interview them in chambers. I'm not going to interview them in the courtroom ... I am going to quash the subpoena."

The review hearing then proceeded to the merits of the case in which the court heard testimony from Ms. Gilliard and Katina M. regarding the children's placement and their relationship with both their foster family and Katina M. At the conclusion of the testimony, the court reaffirmed the permanency plan of adoption and held that the children should remain committed to the custody of BCDSS. Katina M. noted an appeal to the Court of Special Appeals, which affirmed the judgment of the Circuit Court.

In an unreported opinion, the intermediate appellate court first addressed whether the lower court had erred in denying Katina M.'s request for an independent study and held that she had failed to meet her burden of demonstrating good cause for the examination. The intermediate appellate court further opined that Katina M. had failed to show that the examination would not be harmful to the children. In reaching its decision, the Court of Special Appeals held that although Katina M. had tendered the name of the expert and had proposed that a "study" of the children would exclude a discussion of their past history, she did not "proffer how the study would be conducted."

The intermediate appellate court then addressed the trial court's decision to quash the subpoenas for Marchay E. and Samone H., and concluded that the children had been represented by counsel at both hearings and that "their wishes ... 'clearly [had been] before the court for its consideration'" without there being evidence of misrepresentation by their counsel. The intermediate appellate court emphasized that Katina M. had objected to opposing counsel's suggestion that the children be interviewed *in camera* and had "not claim[ed] that the children's wishes regarding visitation with her had been misrepresented." Thus, the Court of Special Appeals held that the lower court had not abused its discretion in quashing the subpoenas.

Katina M. filed a petition for writ of certiorari in this Court to consider the following questions:

1. Is this Court's decision in *In re Mark M.*, 365 Md. 687, 782 A.2d 332 (2001), approving independent examinations of children in CINA cases limited to situations where the proposed examination is the subject of other expert opinion offered in the proceeding, and, in this case, did the trial court fail to adequately balance the *Mark M.* considerations when it refused to grant a requested independent bonding evaluation because it "was satisfied" that "there is a very little bond, if any ... with the mother" and it was not in the children's "best interests" "to put them through that?"

2. Did the trial court abuse its discretion when it refused to hear from the children at the permanency planning review hearing on the grounds that "I am not putting young children on the stand. Period." and "I'm not going to interview them in chambers?"

We granted the petition and issued the writ of certiorari.[8]

## II. Discussion

In the present case, Katina M. asks us to review the trial court's order denying her motion for independent study during a permanency plan review hearing in which the plan remained static. As a threshold matter, we must consider whether the trial court's order is properly appealable.

 In general, appeals may only be taken from a final judgment of the trial court pursuant to Md.Code (1974, 2002 Repl.Vol.), § 12–301 of the Courts and Judicial Proceedings Article, which states that "a party may appeal from a final judgment entered in a civil ... case' ... [whether] entered ... in the exercise of original, special, limited, or statutory jurisdiction, unless ... expressly denied by law." *Smith v. Taylor*, 285 Md. 143, 146, 400 A.2d 1130, 1132 (1979) (internal citations omitted). For the trial court's ruling to be a final

---

8. *In re Samone H.*, 381 Md. 674, 851 A.2d 593 (2004).

judgment it must either determine and conclude the rights of the parties involved or deny a party the means to "prosecut[e] or defend[ ] his or her rights and interests in the subject matter of the proceeding." *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767, 773 (1989). In considering whether a particular court order or ruling constitutes an appealable judgment, we assess whether any further order was to be issued or whether any further action was to be taken in the case. *See Rohrbeck*, 318 Md. at 41–42, 566 A.2d at 774.

An order that is not a final judgment is considered to be an interlocutory order and ordinarily is not appealable unless it falls within one of the statutory exceptions set forth in Md.Code (1974, 2002 Repl.Vol.), § 12–303 of the Court and Judicial Proceedings Article. *See In re Damon M.*, 362 Md. 429, 434, 765 A.2d 624, 627 (2001). Relevant to our discussion is the exception embodied in Section 12–303 of the Courts and Judicial Proceedings Article, which provides:

A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:

* * *

(3) An order:

* * *

(x) Depriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order . . . .

Md.Code (1974, 1998 Repl.Vol.) § 12–303(x) of the Court and Judicial Proceedings Article. In *In re Damon M.*, we assessed whether an appeal would lie from an order entered after a permanency plan review hearing in which the plan had been amended from reunification to long-term foster care, *id.* at 432–33, 765 A.2d at 626, and held that "an order amending a permanency plan calling for reunification to foster care or adoption [was] immediately appealable." *Id.* at 438, 765 A.2d at 628. In so holding, we explained that "the amendment of the permanency plan to long-term or permanent foster care and adoption [was] a change in the terms of the custody

order," and thus, had affected the custody rights of the petitioners. *Id.* at 437, 765 A.2d at 628. We left open the question of whether "other orders that the court might pass after [permanency plan review] hearings [were] appealable." *Id.* at 433 n. 4, 765 A.2d at 626 n. 4.

▆ To be appealable under Section 12–303(x), an order denying a motion for independent study either must operate to deprive Katina M. of the care and custody of Marchay E. and Samone H. or change the terms of her care and custody of the children. Resolution of this question is at the heart of the issue before us.

## A. Fundamental Rights of Parents

The United States Supreme Court has long recognized that a parent has a constitutionally protected fundamental right to raise his or her children. *See Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57 (2000); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923). Recently, in *In re Yve S.,* 373 Md. 551, 819 A.2d 1030 (2003), we iterated this principle and stated that a parent's interest "occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. '[Far] more precious . . . than property rights,' parental rights have been deemed to be among those 'essential to the orderly pursuit of happiness by free men. . . .' " *Id.* at 567, 819 A.2d at 1039, quoting *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994), in turn quoting *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *see also, Shurupoff v. Vockroth,* 372 Md. 639, 650, 814 A.2d 543, 550 (2003); *In re Mark M.,* 365 Md. 687, 705, 782 A.2d 332, 342–43 (2001); *Boswell v. Boswell,* 352 Md. 204, 218, 721 A.2d 662, 669 (1998). Likewise, in *In re*

*Mark M.,* we emphasized the importance of parenting as a fundamental right:

> A parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court. The United States Supreme Court has long avowed the basic civil right encompassed by child rearing and family life. *See Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57 (2000) (stating that "the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *See also Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982) (discussing "the fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972)(stating that "[t]he rights to conceive and to raise one's children have been deemed 'essential,' and that '[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment ... the Equal Protection Clause of the Fourteenth Amendment ... and the Ninth Amendment ....')(internal citations omitted). Maryland, too, has declared a parent's interest in raising a child to be so fundamental that it 'cannot be taken away unless clearly justified.' " *Boswell v. Boswell,* 352 Md. 204, 218, 721 A.2d 662, 669 (1998)(citing *In re Adoption No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994)).

365 Md. at 705, 782 A.2d at 342–43.

A parent's right to raise his or her children, however, is not absolute, and there may be countervailing considerations that the State, pursuant to its *parens patriae* authority, must protect. Indeed, in *In re Mark M.* we stated:

> That fundamental interest, however, is not absolute and does not exclude other important considerations. Pursuant to the doctrine of *parens patriae,* the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. *See Boswell,* 352 Md. at 218–19, 721 A.2d at 669. We have held that "the best interests of the

child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *Boswell,* 352 Md. at 219, 721 A.2d at 669; *see also In re Adoption No. 10941,* 335 Md. at 113, 642 A.2d at 208 (stating that "the controlling factor . . . is . . . what best serves the interest of the child"). That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent. As we stated in *In re Adoption/Guardianship No. A91–71A,* 334 Md. 538, 640 A.2d 1085 (1994), the child's welfare is a consideration that is of transcendent importance' when the child might otherwise be in jeopardy. *Id.* at 561, 640 A.2d at 1096 (citation omitted).

\* \* \*

We have recognized that in cases where abuse or neglect is evidenced, particularly in a CINA case, the court's role is necessarily more pro-active. *See In re Justin D.,* [357 Md. 431, 448, 745 A.2d 408, 417 (2000) ].

\* \* \*

A trial court, acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests.

*Id.* at 365 Md. at 705–07, 782 A.2d at 343–44.

### B. Permanency Plans in CINA Proceedings

In response to concerns that children were being lost in the foster care system without belonging to a permanent family, Congress enacted Public Law 96–272, the "Adoption Assistance and Child Welfare Act of 1980," codified at 42 U.S.C. §§ 670–79 (1988), which required states, among other things, to "provide a written case plan for each child for whom the state claims federal foster care maintenance payments." 42 U.S.C. § 671(a)(16); *see also In re Yve S.,* 373 Md. at 574–75, 819 A.2d at 1044. Pursuant to Congress's mandate, Maryland created a statutory scheme directing the department of social

services to "develop and implement a permanency plan that [was] in the best interests" of those children committed to the local department of social services. *In re Yve S.,* 373 Md. at 574, 819 A.2d at 1044, quoting *In re Adoption/Guardianship No. 10941,* 335 Md. at 103–06, 642 A.2d at 203–05 (1994); Md.Code (1984, 1999 Repl.Vol., 2002 Cum.Supp.), § 5–525(e) of the Family Law Article. In *In re Damon M.,* we identified the importance of a permanency plan:

> The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement. It provides the goal toward which the parties and the court are committed to work. It sets the tone for the parties and the court and, indeed, may be outcome determinative. Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan. And, because it may not be changed without the court first determining that it is in the child's best interest to do so, the permanency plan must be in the child's best interest. These are the reasons, no doubt, that the court is charged with determining the plan and with periodically reviewing it, evaluating all the while the extent to which it is being complied with.

362 Md. at 436, 765 A.2d at 627–28. Most recently, in *In re Yve S.* we explained the need for trial courts to review permanency plans to ensure that children are being cared for in the best possible manner:

> As *In re Damon M.* observes, the purpose of a permanency plan is to set the direction in which the parent, agencies, and the court will work in terms of reaching a satisfactory conclusion to the situation. Once set initially, the goal of the permanency plan is re-visited periodically at hearings to determine progress and whether, due to historical and contemporary circumstances, that goal should be changed. It is not the purpose of the initial permanency plan hearing, however, to resolve all issues involved in that final resolution. If that were the case, there would be no need for

review of how, on a regular basis, the plan is progressing or not. Also as *In re: Damon M.* indicates, the initial permanency plan hearing is to be held and conducted expeditiously. Protracted proceedings in establishing the initial plan defeat the purpose of the statute. The statute presumes that, unless there are compelling circumstances to the contrary, the plan should be to work toward reunification, as it is presumed that it is in the best interest of a child to be returned to his or her natural parent.

373 Md. at 582, 819 A.2d at 1049.

In *In re Yve S.* quoting from *In re Damon M.*, we also delineated the requirements a trial court must follow when implementing a permanency plan:

[T]he court has the responsibility for determining the permanency plan, § 3–826.1(a)(1) and justifying the placement of children in out of home placements for a specified period or on a long-term or permanent basis, § 3–826.1(d), in addition to conducting periodic, six month reviews. § 3–826.1(f).

*　　*　　*

Section 3–826.1 [now codified as Section 3–823 of the Courts and Judicial Proceedings Article] requires the court, not later than 11 months after a child found to be in need of assistance has been placed in foster care, see also Md.Code (1989, 1991 Repl.Vol., 1997 Cum.Supp.) § 501(m) of the Family Law Article, to hold a permanency planning hearing to determine the permanency plan for that child. § 3–826.1(a)(1) [now § 3–823(b)(1) ]. At that hearing, for each child in placement and in determining the plan, the court is required to make certain decisions and findings, § 3–826.1(c), [now § 3–823(e) ] specifically, whether the child should be: returned to the parent or guardian, § 3–826.1(c)(1)(i) [now § 3–823(e)(1)(i) ]; placed with relatives to whom adoption or guardianship is granted, § 3–826.1(c)(1)(ii) [now § 3–823(e)(1)(ii)]; placed for adoption, § 3–826.1(c)(1)(iii) [now § 3–823(e)(1)(iii) ]; emancipated, § 3–826.1(c)(1)(iv) [now deleted]; or because of the child's

special needs or circumstances, continued in placement on a permanent or long-term basis or for a specified period. § 3–826.1(c)(1)(v) and (vi) [now § 3–823(e)(1)(v) and (vi) ]. There are restrictions on the court's ability to continue a child in placement because of the child's special needs or circumstances. § 3–826.1(d) [now § 3–823(f) ]. That section prohibits the court from using that option unless it finds that the agency to which the child is committed has documented a compelling reason for determining that it would not be in the best interest of the child to:

(1) Return home;

(2) Be referred for termination of parental rights; or

(3) Be placed for adoption or guardianship with a specified and appropriate relative or legal guardian willing to care for the child.

*Id.* at 577–81, 819 A.2d at 1046–48 (additions in original). We explained:

Section 3–826.1(f) [now § 3–823(h) ] mandates periodic reviews of the permanency plan by the court. Subsection (f)(1)(i) provides [now § 3–823(h)(1)(i) ] that such reviews will be "no less frequently than every six months until commitment is rescinded." If, however, at the permanency planning hearing or a subsequent review hearing, the court, inter alia, orders a child continued in permanent foster care, the court is no longer required to hold the review hearings at six month intervals. Subsection (f)(1)(ii) [now § 3–823(h)(1)(ii), is revised to require review hearings every 12 months.]. As is true of the initial permanency planning hearing, the court must make some determinations at the hearing to review the permanency plan.

§ 3–826.1(f)(2) [now § 3–823(h)(2) ]. Among other things, in addition to determining whether the commitment remains necessary and appropriate, subsection (f)(2)(i) [now § 3–823(h)(2)(i)], and evaluating the progress made toward alleviating or mitigating the causes of the commitment, subsection (f)(2)(iii) [now § 3–823(h)(2)(iii) ], the court is required to "determine the extent of compliance with the permanency

plan," Subsection (f)(2)(ii) [now § 3–823(h)(2)(ii)], and to change it "if a change in the permanency plan would be in the child's best interest." Subsection (f)(2)(v) [now § 3–823(h)(2)(vi)].

*Id.* at 581, 819 A.2d at 1048 (additions in original).

## Motions for Independent Study

As part of a court's determination regarding the appropriate permanency plan for a child's placement, a judge may authorize an independent study concerning matters arising in juvenile proceedings pursuant to Section 3–816 of the Courts and Judicial Proceedings Article: [9]

(a) *Study authorized.*—After a petition if filed under this subtitle, the court may order the local department or another qualified agency to make or arrange for a study concerning the child, the child's family, the child's environment, and other matters relevant to the disposition of the case.

(b) *Examination by professionally qualified person.*—(1) As part of a study under this section, the court may order that the child or any parent, guardian, or custodian be examined at a suitable place by a physician, psychiatrist, psychologist, or other professionally qualified person.

(2)(i) The court may not order an inpatient evaluation unless, after a hearing, the court finds that an inpatient evaluation is necessary and there are no less restrictive means to obtain an evaluation.

(ii) Placement in an inpatient facility may not exceed 21 days unless the court finds good cause.

(c) *Admissibility; inspection; impeachment evidence.*—(1) The report of a study under this section is admissible as evidence at a disposition hearing but not at an adjudicatory hearing.

---

**9.** Section 3–816 was derived from former Maryland Code (1974, 1998 Repl.Vol., 2001 Cum.Supp.), § 3–818 of the Courts and Judicial Proceedings Article. *See* 2001 Laws of Maryland, ch. 415 § 3, effective October 1, 2001.

(2) The attorney for each party has the right to receive the report at least 5 days before its presentation to the court, to challenge or impeach its findings and to present appropriate evidence with respect to it.

Md.Code (1974, 2002 Repl.Vol.), § 3–816 of the Courts and Judicial Proceedings Article.

Similarly, in juvenile proceedings, Maryland Rule 11–105 provides the procedure for mental and physical examinations:

a. Examination Procedure.

1. Order for examination. Any order for a physical or mental examination pursuant to Section 3–818 of the Courts Article shall specify the time, place, manner, conditions and scope of the examination and the person or persons by whom it is to be made. The court shall order that the examination be conducted on an outpatient basis if, considering the child's condition, that is feasible and appropriate. The order may regulate the filing of a report of findings and conclusions and the testimony at a hearing by the examining physician, psychiatrist, psychologist or other professionally qualified person, the payment of the expenses of the examination and any other relevant matters.

2. Service of copies of report. Copies of all studies and reports of examinations made to the court under this Rule shall be furnished by the court to counsel for the parties when received by the court, but not later than two days before any hearing at which the results of the examinations will be offered in evidence.

We have held that in addition to the State, a parent or other party in a CINA proceeding may make a motion for independent study, and whether a study should be conducted is left to the court's discretion; furthermore, the person performing the independent examination must be professionally qualified to conduct the examination. *In re Mark M.*, 365 Md. at 715, 782 A.2d at 348–49. When a party moves for an independent evaluation, that party "must demonstrate good cause for such an examination," show that "the examination should be reasonably calculated to assist the trier of fact in rendering its

decision," and must demonstrate that the "proposed examination will not be harmful to the child." *Id.* at 717–18, 782 A.2d at 350.

## Bonding Studies

In the case before us, Katina M. made a motion for independent study to have a psychiatrist examine any "bond" she may have had with Marchay E. and Samone H. Drs. James and Constance Messina, psychologists who have specialized in working with children, describe bonding as:

> [T]he forming of a mutual emotional attachment between parent and child. [T]he giving of unconditional love by the parent to the child. [T]he development of an emotional connection between parent and child. [T]he development of a sense of security for the child. [T]he establishment of an emotional intimacy and sense of closeness between parent and child. [T]he beginning step in helping the child to feel a healthy self-worth and self-esteem. [T]he transmission of familial ties between child and parent through which non-verbal communication and understanding takes place. [A] means of providing the child with a sense of belonging to a family. [A] way of bringing the child into the larger network of caring and love present in the parent's extended family. [T]he concern and love for the child by the parent, and for the parent by the child, which is exhibited in all aspects of both their lives.

James J. Messina & Constance Messina, *Tools for Parents of Children with Disabilities and Special Needs: Bonding with Your Child* 1 (2004). In the context of the relationship between a parent and child, the term "bonding" has come to be used synonymously with "attachment." BRUCE PERRY, BONDING AND ATTACHMENT IN MALTREATED CHILDREN: CONSEQUENCES OF EMOTIONAL NEGLECT IN CHILDHOOD 4 (Caregiver Educ. Series, 2001) [hereinafter "CONSEQUENCES OF EMOTIONAL NEGLECT"]. Dr. Perry, a psychiatrist specializing in child trauma, explained that "bonding is the process of forming an attachment ... and involves a set of behaviors that will help lead to an emotional connection (attachment)." *Id.* at 3. In

articulating the importance of the parent-child relationship to the development of a child, Dr. Perry has opined that the attachment bond has several key elements, namely, that it is an "enduring emotional relationship with a specific person; ... the relationship brings safety, comfort, soothing and pleasure; ... and loss or threat of the person evokes intense distress." *Id.* at 4.

Studies of bonding, then, involve an evaluation of emotional relationships, or more specifically, as the Judicial Education Center of New Mexico (JEC) has stated:

> The purpose of a bonding study is to determine whether a bond or attachment exists between a parent and a child....
> The bonding issue in permanency planning is the extent to which the parent is capable of caring for the child from the perspective of bonding and attachment. The bonding study draws data from observation, from social and interpersonal reports, and from cognitive and emotional assessments. The Bonding study moves in two directions. One track is the child's bonding issues with the parent. The other track comprises the bonding and attachment issues of the parent.

(internal citations omitted). JEC, 37 CHILD WELFARE HANDBOOK, BONDING OR INTERACTIONAL STUDY 37.1.3 (Jud. Educ. Ctr.1997, 2003 Supp.) [hereinafter "CHILD WELFARE HANDBOOK"]. Bonding studies trace their roots back to the 1930's when researchers began to analyze the interaction between mother and child. *See* David E. Arredondo, M.D., and Hon. Leonard P. Edwards, *Attachment, Bonding, And Reciprocal Connectedness*, 2 J. CTR. FOR FAM., CHILD. & CTS. 109, 110 (2000) [hereinafter "Attachment & Bonding"]. Eventually, during the 1960s and 1970's, Dr. Mary Ainsworth, a distinguished researcher in developmental psychology, with other researchers and clinicians, conducted experiments in which she monitored the behavior of an infant child by having the child sit with the parent in a furnished playroom while a stranger would enter and then leave. Subsequently, the parent would then leave and reenter. *Id.* at 13. As a part of the experiment, Dr. Ainsworth would observe the child for signs of distress, attachment, and any exploratory behavior when the

caregiver would leave and reenter the room. Based upon the child's responses, Dr. Ainsworth would provide an opinion about the child's relationship with the parent. *Id.* Her experiments became the basis for modern bonding studies that are often presented in juvenile and family court proceedings. *Id.* at 113.

Although bonding studies apparently have been conducted during the last thirty years, if not longer, there appear to be no uniform procedures for conducting such studies. In 1988, the American Psychiatric Association (APA) published guidelines for conducting a psychological evaluation of a child in custody dispute, *see* CHILD CUSTODY CONSULTATION: REPORT OF THE TASK FORCE ON CLINICAL ASSESSMENT IN CHILD CUSTODY 1 (1988) [hereinafter "TASK FORCE REPORT"], and suggested that when assessing the parent-child bond, the psychiatrist should observe the interaction between the child and parent and measure whether the parent is able to empathize and communicate with the child. *Id.* at 6. To discern any "bond," the task force report suggested that the psychiatrist also may ask the child to draw pictures of the family and make "wishes" about what is important to him or her, and also could present scenarios to elicit responses from the child evidencing his or her feelings toward each parent. *Id.* Although it cannot be predicted how many interviews the psychiatrist would need to conduct with the child, the task force report opined that eight to eighteen sessions may be required. *Id.* at 8. In addition, the task force indicated that the psychiatrist should conduct interviews of the parents and other persons of importance, such as the grandparents, stepparents, or caregiver, and examine any social service records, school reports, psychological test results, or medical records of the child. *Id.* at 6–7.

In the juvenile or family court context, bonding studies are used to evaluate the quality of the parent-child relationship, which may assist the court in determining the nature and extent of the custody it could chose to award to the parent figure. *See Bonding & Attachment*, at 114. In particular, these studies have been used to decide questions regarding permanency planning, foster care, a parent's ability to nurture

the child, custody disputes, and other placement decisions and arise when a psychologist or psychiatrist is called to testify in a court proceeding. *See Bonding & Attachment,* at 114. The American Psychological Association explained the role of a psychologist or psychiatrist in a juvenile proceeding as that of a professional expert who maintains an impartial stance when informing and advising the court of the relevant psychological factors involved in a custody dispute. *See* American Psychological Association, 49 GUIDELINES FOR CHILD CUSTODY EVALUATIONS IN DIVORCE PROCEEDINGS No. 7, 677–80 (July 1994) [hereinafter "CHILD CUSTODY EVALUATIONS"]. In addition, social workers also offer opinions on the existence of bonding in the parent-child relationship. *See Bonding & Attachment,* at 114. According to the American Association for the Advancement of Science (AAAS), clinicians participate in approximately one million legal cases annually. *See* David Faust & Jay Ziskin, *The Expert Witness in Psychology and Psychiatry,* SCIENCE RESOURCE CENTER 1 (1988). Often, when psychologists or psychiatrists are asked to complete a bonding study or evaluation they submit a report to the court detailing their findings and opinions. *Id.* Dr. David Arredondo and Judge Leonard Edwards, Superior Court of California, identified practical questions a judge should ask when evaluating a clinician's report, including the expert's qualifications, the methods employed in conducting the evaluation, and the child's family relationship. *Bonding & Attachment* at 121–22.[10]

---

**10.** An example of the methods that psychologist John Mealy utilizes when conducting evaluations of children declared to be in need of assistance, can be found in *In re Adoption/Guardianship of Mark M.,* 147 Md.App. 99, 807 A.2d 789 (2002). Dr. Mealy testified in Mark M.'s TPR proceeding that if he were to conduct an evaluation of Mark M. he would review the files of the Department of Social Services and the Public Defender's Office, examine the testimony of Mark M.'s therapist, and interview Mark M. about his biological mother and grandmother. *Id.* at 103–04, 807 A.2d at 791–92. During the interview, Dr. Mealy also would ask Mark M. questions about his home life and school. *Id.* at 104, 807 A.2d at 792. In addition, Dr. Mealy would interview Mark M.'s biological mother. *Id.* He estimated that a thorough evaluation of Mark M. would take approximately 20 hours. *Id.*

Furthermore, the American Academy of Child and Adolescent Psychiatry (AACAP) set forth criteria developed by several clinicians and researchers on how to conduct a child custody evaluation: when conducting the evaluation of the child the psychiatrist should assess the continuity and quality of the attachment between the parent and child. *See* AACAP, PRACTICE PARAMETERS FOR CHILD CUSTODY EVALUATIONS at 5 (1997) [hereinafter "PRACTICE PARAMETERS"]. In making such assessments, the clinician should examine all medical, educational, and psychiatric records that are available and that may provide information on the parenting of the child. *Id.* at 13. In addition, the evaluator should interview the parents, the caregiver, and the children to ascertain the nature of their interactions with each other. *Id.* at 13–15.

The Fresno County, California Mental Health Plan Provider Manual (July 2002) [hereinafter "Fresno County Manual"] also provides insight into the conduct of bonding studies, which are "conducted when the case is set for a permanent plan hearing and possible termination of parental rights":

> It is a structured analytical interview including a mental health assessment (define or rule out clinical diagnosis using DSM IV) of both parent(s) and the child(ren), conducted by a Licensed Mental Health Clinician with appropriate experience. Assessment of the interaction between the parent(s) and the child(ren). Use of testing instruments as needed, to more accurately gauge the strength of the bond between parent and child.

Fresno County Manual, § 14.2.5 Bonding Study (July 2002). According to the Fresno County Manual, when ordering a bonding evaluation the court should request that the clinician answer the following questions:

1. Do the child and the parent have a parent/child relationship (as opposed to that of a child with a friend, occasional baby-sitter, or extended family member)? If yes, describe the relationship.

2. If the answer to question # 1 is yes, does the child have a substantial, positive emotional attachment to the parent

such that the child would be greatly harmed if this parent/child relationship were terminated?

3. If the answer to question # 2 is yes, would continuing this parent/child relationship promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents?

Fresno County Manual, § 14.2.5 Bonding Study.

Although model practices and procedures for conducting bonding studies have not been adopted, some of the courts from our sister states have recognized the studies as beneficial in deciding what is in the child's best interest. *See In re T.S. et al.*, 113 Cal.App.4th 1323, 7 Cal.Rptr.3d 173, 175 (2003); *In re Adoption of Rhona*, 57 Mass.App.Ct. 479, 784 N.E.2d 22, 32 (2003); *In re J.J.G.*, 287 Mont. 313, 954 P.2d 1120, 1123–24 (1998); *In re Guardianship of J.P. and B.P.*, 180 N.J. 494, 852 A.2d 1093, 1100 (2004); *In the Matter of Adoption of a Child by P.S. and H.S.*, 315 N.J.Super. 91, 716 A.2d 1171, 1188 (1992); *In the Matter of the Guardianship of J.C., J.C., and J.M.C.*, 129 N.J. 1, 608 A.2d 1312, 1323–24 (1998); *In re Julissa O.*, 746 A.2d 1137, 1140–41 (Pa.Super.2000). None of the courts in these cases, however, have opined that the decision to grant or deny a motion for a bonding study would be considered a deprivation of parental rights or alteration of the terms of a custody order *per se*.[11]

---

11. For example, in New Mexico, one statutory ground for terminating a parent's rights is based upon a court's assessment of the child's bond with the caregiver and the biological parent. *See* NMSA § 32A–4–28(B)(3) (1978, Repl.Pamp.1995). Under this statute a finding by a court that the natural parent has purposefully sought to destroy the bond with the child creates a rebuttable presumption that the biological parent has abandoned the child. *See* NMSA § 32A–4–28(C) (1978, 1995 Repl. Pamp.1995). Other state courts, however, have found that whether a parent-child bond exists aids the court in drawing legal conclusions in the case, but that a lack of "bonding" alone cannot result in a termination of the parties' rights. *See A.M. v. State*, 891 P.2d 815, 822 (Alaska 1995), *overruled on other grounds in In re S.A.*, 912 P.2d 1235, 1239 (Alaska 1996); *In re Alana S.*, 802 A.2d 976, 980 (Me.2002); *In the Matter of the Adoption of a Child by P.S. and J.S.*, 315

## Is the Denial of a Bonding Study in a Permanency Plan Situation Appealable?

To determine appealability in this case, it is necessary for us to consider what parental rights, if any, are implicated in a motion for independent bonding study made during a permanency plan review hearing that resulted in, continuation of the same permanency plan. In the case before us, Katina M. sought a change of the existing permanency plan to reunification during the review hearing, and in support thereof, requested a bonding study under Section 3–816 to refute the testimony, which she classified as expert, of the social worker who testified about the level of bonding between the children and Katina M. and the foster parents. We recognize that the levels of bonding or "attachment and emotional ties" to the child's parent, and to the "caregiver," testified by the social worker, are significant facts to be considered in the development of a permanency plan pursuant to Section 5–525(e)(ii) and (iii) of the Family Law Article, but are not the only factors, so that the denial of a bonding study would not *per se* affect parental rights in the permanency planning context.

We also have not previously addressed whether a social worker's testimony on "bonding" should be considered as factual or as expert opinion, governed by Maryland Rule 5–702,[12] as Katina M. has asked us to do, which she posits supports appealability of the denial of the bonding study. In this regard, the Court of Special Appeals, although not ad-

---

N.J.Super. 91, 716 A.2d 1171, 1182 (1998); *In re E.M. a/k/a E.W.C. and L.M. a/k/a L.C., Jr.*, 533 Pa. 115, 620 A.2d 481, 485 (1993).

**12.** Md. Rule 5–702 states:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

dressing this specific question, has limited a social worker's testimony during CINA proceedings to lay observations of the children. In *In re Adoption/Guardianship Nos. 2152A, 2153A, 2154A*, 100 Md.App. 262, 641 A.2d 889 (1994), the Court of Special Appeals held that the social worker was competent to testify as a lay witness "about the behavior of the children that she heard and saw first hand and the efforts that she undertook to prepare the children for the changes that they were facing," *id.* at 276, 641 A.2d at 895, all of which were factual matters compared to evaluative opinions, but limited the social worker so that she would not be "permitted by the trial court to express any expert opinion about the adjustments of the children to their foster homes." *Id.*

Various of our sister states have determined social worker's testimony about bonding to be equivalent to expert testimony when it was evaluative in nature. *See In re Luke M. et al.*, 107 Cal.App.4th 1412, 132 Cal.Rptr.2d 907, 917 (2003) (considering social worker's testimony, "it would be detrimental for [the children] to live with [the biological father] in Ohio because they were bonded with [the foster parents]," to be evaluative in nature); *In the Interest of S.O. et al.*, 483 N.W.2d 602, 604 (Iowa 1992) (determining that social worker's testimony was evaluative when she described the bond between the mother and her two older daughters as unhealthy); *In re the Adoption of M.T.S.*, 489 N.W.2d 285, 287 (Minn.App.1992) (qualifying two social workers as experts to testify about the child's bond with the natural parents); *In the Matter of Amanda Broadway*, 191 Or.App. 78, 81 P.3d 99, 103 (2003) (viewing social worker's testimony that the "mother and her children had a 'strong attachment' to each other" as evaluative in nature); *Roberts v. Roberts*, 835 P.2d 193, 195 (Utah App.1992) (considering a social worker's testimony regarding the "strength of [mother's] bond with the children" as evaluative in nature); *In re D.C.*, 163 Vt. 517, 659 A.2d 1145, 1148 (1995) (treating social worker's testimony that "taking a special needs child from the family with which the child had bonded would have negative therapeutic implications for the child" as appropriate expert testimony).

■ Whether social workers testify about their observations regarding the bond between the parent or caregiver and child as a fact witness, or give an evaluation about the state of a bond between the parent or caregiver and the child as an expert, the court in its discretion may order an independent medical examination of the child. *In re Mark M.,* 365 Md. at 715, 782 A.2d at 348–49. It is not necessarily the nature of the testimony in the action that controls the decision, but whether the proponent of the examination satisfies the factors articulated in *In re Mark M.,* to "demonstrate good cause for such an examination," show that the examination is "reasonably calculated to assist the trier of fact in rendering its decision," and establish that the "proposed examination will not be harmful to the child." *Id.* at 717–18, 782 A.2d at 350.

With respect to the last factor in deciding whether a psychological examination would be harmful to a child, courts of other jurisdictions have considered the age and emotional condition of the child, the nature of the allegations of abuse and neglect, the strength of the relationship between the child and parent, and the child's difficulty in discussing family related issues. *See In the Matter of Thea T.,* 174 Misc.2d 227, 663 N.Y.S.2d 502, 504 (N.Y.Fam.Ct.1997); *Matter of Nicole,* 146 Misc.2d 610, 551 N.Y.S.2d 749, 751–52 (N.Y.Fam.Ct.1990); *In re Child M.,* 452 Pa.Super. 230, 681 A.2d 793, 802 (1996). In addition, courts have assessed the nature of the examination by probing the qualifications of the clinician conducting the evaluation, including: his or her training, background, experience; the number of sessions the child would meet with the therapist; and the methodology employed during the sessions. *See In the Matter of Kaitlyn S.,* 148 Misc.2d 276, 560 N.Y.S.2d 88, 93 (N.Y.Fam.Ct.1990); *Matter of Nicole,* 551 N.Y.S.2d at 752–53; *In re Child M.,* 681 A.2d at 802.

In the case *sub judice,* the court exercised its discretion in denying Katina M.'s motion for a bonding study, but confirmed the permanency plan with additional time for visitation based, in part, upon the court's view of the bond that the children had with Katina M. and the caregiver. As such, the denial of the bonding study would only be appealable as an

interlocutory order under Section 12–303(x) if it deprived Katina M. of her right to care and custody of the children or changed the terms of her parental rights. *See In re Damon M.,* 362 Md. at 438, 765 A.2d at 628. In maintaining the permanency plan to proceed with the adoption of the children, the trial court continued the permanency plan from the prior year, as well as allowed Katina M. increased access to her children. Katina M.'s rights would have been implicated had she made the motion for bonding study and appealed its denial when the court changed the permanency plan from reunification to adoption pursuant to Section 3–823(e) and (g) of the Courts and Judicial Proceedings Article, and our decision in *In re Damon M.,* 362 Md. 429, 765 A.2d 624 (2001), but not when the judge continued the plan and increased visitation.

 We acknowledge that bonding studies can be beneficial to the determination of a permanency plan and may assist the court in making decisions about a child's placement. Nevertheless, based upon the circumstances of this case, we conclude that the trial court's order denying the motion for such a study is not an appealable final judgment and does not constitute an interlocutory order under Section 12–303(x).[13]

---

**13.** Court orders denying a motion for independent study likewise are not appealable under the collateral order doctrine. To be appealable under this narrow exception, the order must satisfy the following four requirements:

(1) it must conclusively determine the disputed question;
(2) it must resolve an important issue;
(3) it must be completely separate from the merits of the action; and
(4) it must be effectively unreviewable on appeal from a final judgment.

*See Dawkins v. Baltimore City Police Department, et al.,* 376 Md. 53, 58, 827 A.2d 115, 118 (2003); *In re Foley,* 373 Md. 627, 633–34, 820 A.2d 587, 591 (2003); *Montgomery County v. Stevens,* 337 Md. 471, 477, 654 A.2d 877, 880 (1995). We have emphasized that "[t]he four elements of the test are conjunctive in nature and in order for a prejudgment order to be appealable and to fall within this exception to the ordinary operation of the final judgment requirement, each of the four elements must be met." *Dawkins,* 376 Md. at 59, 827 A.2d at 118. "Furthermore, in Maryland the four requirements of the collateral order doctrine are very strictly applied, and appeals under the doctrine may be

The second issue for consideration is whether the trial court erred in quashing the subpoenas for the children to testify during the permanency plan review hearing and declining to interview the children *in camera.* The trial judge's actions arose within the context of a permanency plan review hearing, after which he continued the previous permanency plan of adoption, as well as increased Katina M.'s visitation. Because the order continuing the permanency plan did not adversely affect Katina M.'s parental rights or change the terms of the permanency plan to Katina M.'s increased detriment, the trial judge's actions are not reviewable by this Court.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED, AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO DISMISS APPEAL; PETITIONER TO PAY COSTS.*

---

entertained only in extraordinary circumstances." *Id.,* quoting *Pittsburgh Corning v. James,* 353 Md. 657, 666, 728 A.2d 210, 214 (1999).

A court order denying a motion for independent study is not appealable as a collateral order. First, an order denying a motion for independent study does not conclusively determine the question of whether the permanency plan should have been changed from adoption to reunification. The trial court pursuant to Maryland Code, Section 3–801(f) of the Courts and Judicial Proceedings Article and Maryland Code, Section 5–525(e) of the Family Law Article, considers several factors in reviewing the permanency plan, one of which is the parent-child relationship. Second, although a motion for independent study is important in permanency planning, it is not completely separate from the merits of the action because such studies are one factor that the court relies upon to assess child placement. Finally, the motion for independent study is reviewable on appeal when its denial affects the parental custodial rights. Thus, the collateral order doctrine is also unavailable as a means to appeal the court's order denying Katina M.'s motion for independent study.