874 A.2d 998

In re ASHLEY E., Laione D., Matthew B., and Gregory B.-G.

No. 90, Sept. Term, 2004.

Court of Appeals of Maryland.

May 17, 2005.

Nenutzka C. Villamar, Asst. Public Defender (Nancy S. Forster, Public Defender, Julia Doyle Bernhardt, Asst. Public Defender, on brief), for petitioners.

C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Nancy C. Hopkins, Asst. Atty. Gen., on brief), for respondent.

Debra Gardner, John Kopolow, Wendy Hess, Baltimore, amicus curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE JJ.

BATTAGLIA, J.

This case arises out of a permanency planning hearing held on October 1, 2003, in the Circuit Court for Montgomery County, sitting as a juvenile court. We are asked to determine whether permanency planning hearings under Maryland Code (1973, 2002 Repl.Vol.), Section 3–823 of the Courts and Judicial Proceedings Article are a form of disposition hearing under Maryland Rule 11–115, in which the application of the rules of evidence are discretionary and informal, or whether the rules of evidence must be applied during permanency planning hearings. Also we are asked to address whether employees of a local department of social services, who are not presently involved in the case before the court, but were previously, can be present during otherwise confidential juvenile court proceedings. Because we find that a permanency planning hearing is a type of disposition hearing as described by Maryland Rule 11–115d., we hold that the Maryland Rules of evidence apply informally to such hearings in accordance with Maryland Rule 5–101(c). Moreover, we conclude that the juvenile court did not commit error in permitting the department employees to remain in the courtroom during the pro-

ceedings. Therefore, we affirm the judgment of the Court of Special Appeals.

## Facts[1]

The children, who are the subject of the permanency planning hearing at issue, are Gregory B.-G., born August 6, 1993, now eleven years old; Matthew B., born August 26, 1994, now ten years old; Laione D., born December 6, 1995, now nine years old; and Ashley E., born November 24, 1997, now seven years old.[2] Petitioner is the children's biological mother, Ms. B., and has identified various putative fathers for the children.

Ms. B. and the children first became involved with the Child Welfare Services Unit of the Montgomery County Department of Health And Human Services ("the Department") in August of 2001 while residing in Rockville, Maryland. Although it did not eventuate, Ms. B. contacted the Department seeking assistance in caring for the children because she anticipated being incarcerated due to an outstanding warrant. In October of 2001, the Department helped Ms. B. in making arrangements for her children while she resolved the warrant issue. In November of 2001, Ms. B. and the children became homeless, and she once again sought help from the Department. The Department arranged for temporary shelter, medical treatment for Gregory for a mass in his larynx, and foster care for the children when Ms. B. was hospitalized for complications of a pregnancy, which ended in miscarriage.

---

1. Many of the following facts were recited in the opinion of the Court of Special Appeals, although we have exercised our license to add or delete specific facts where appropriate.

2. The juvenile court granted an uncontested termination of parental rights with respect to Ashley E. and Laione D. on November 2, 2004. A contested termination of parental rights hearing concerning Matthew B., which occurred over a period of several days, was concluded on October 1, 2004. The juvenile court is holding its ruling in that case *sub curia.* On August 31, 2004, the permanency plan for Gregory B.-G. was changed to Another Permanent Living Arrangement. Therefore, the appeal is moot as to Ashley and Laione; however, because the issues raised by this appeal cannot be described as applying to one child but not another, our analysis remains unchanged.

On January 31, 2002, Laione, then six years of age, informed her first grade teacher that "her dad" had "pushed [her] down and stuck a ... beer bottle in [her] butthole." The teacher immediately reported the suspected child sexual abuse to the Department's Child Protective Services unit. According to her teacher, Laione was very upset and crying when she revealed the abuse and demonstrated the position in which she was restrained when she was abused. Moreover, Laione had been having problems at school due to exhibiting sexually inappropriate behavior. The teacher also reported that Laione wore dirty clothes to school, had an unpleasant odor due to a lack of proper hygiene, and regularly urinated or defecated on herself, usually immediately prior to leaving school to return home.

A social worker from the Department interviewed Laione. Using anatomically correct dolls, Laione demonstrated that a male, whom she identified as "Sean," had put his penis in her mouth. She also described her mother's sexual activities, and in doing so, spontaneously got on the cot in the interview room and imitated her mother's actions and noises when engaged in sexual activity.

The next day, at the request of the social worker, Ms. B. brought all of the children to the Department to be interviewed. During that interview, Laione recanted her prior statements and denied having "sa[id] anything about penises in the mouth" the day before, but then continued to talk about Ashley and Gregory "sexing." Gregory denied any sexual contact with his sister, but demonstrated a "horsie" game he played with the girls, which had sexual overtones.[3]

At the social worker's direction, Ms. B. took the children to the Sexual Abuse and Assault Center at Shady Grove Hospital to be examined. Laione's physical examination revealed signs of "chronic vaginal penetration" and that the "circumference around the anus and the area around the vaginal opening

---

3. Matthew and Ashley were not interviewed that day because the children were too tired to continue.

[were] colored with … magic marker." The forensic nurse, who conducted the examination, concluded, from the precision of the markings and the fact that they would have caused pain, that they were not self-inflicted. Laione repeated her previous statement that "Sean" had put a beer bottle in her "butthole"; she later stated that a glass had been inserted. She denied having sex with anyone, saying, "Nobody's ever sexed me because I'm too ugly." She reported that Gregory had done "nasty stuff" and that Ashley had "stopped doing that nasty stuff."

When the social worker confronted Ms. B. about the children's medical and behavioral problems, Ms. B. denied them and became angry and defensive. She blamed the children's problems on the school system and told the social worker that she was going to leave the country. After the initial investigation, the social worker contacted Ms. B. three or four times and scheduled three appointments for Ms. B. to bring Ashley and Matthew to be interviewed; however, Ms. B. failed to comply. Ms. B. continued to complain about the ongoing nature of the investigation and expressed irritation at the Department's continued involvement. When the social worker attempted to accommodate Ms. B.'s work schedule when setting up appointments, Ms. B. did not respond.

During this period, Ms. B. was involved sexually with two men: "Big Gregory" and "Monte," Ashley's putative father. When Ms. B. told the social worker that the men no longer had contact with the children, the Department transferred the case to the intensive family services unit, which provided a parent aide several times a week.

That arrangement was in effect until April 22, 2002, when Laione made another sexual abuse disclosure to her teacher. Laione stated that she had seen her mother "sexing it up" with two men in the bathroom, and when the three adults moved to another room "to do it harder," her mother told her to "come join in" and watch Big Gregory perform a sex act upon her. Laione quoted her mother, using sexually explicit adult language that would not be in the ordinary vocabulary of

a young child. When Laione's teacher suggested that they speak to the school counselor, Laione screamed and begged the teacher not to tell for fear that Ms. B. would kill her. Laione also revealed that Big Gregory had banged Gregory's head against the wall.

That day, the teacher made a second report of sexual abuse to the Child Protective Services unit, and the children were placed in emergency shelter care and interviewed. Laione was fearful at first, saying that what had occurred was a "secret" that she was "afraid to tell" and that it was none of the social worker's business. She then spelled out the word "sex" and described her mother and Big Gregory and Monte "in the bathroom . . . sexing" with their clothes off. She talked about a time when Ms. B. and Big Gregory were in bed and Ms. B., seeing her in the room, asked her to join in and perform a sex act. Once again, Laione quoted her mother, using sexually explicit, age inappropriate language. She also described seeing Gregory in the closet with Ashley, "sexing," and said that afterward Ashley complained, "My poo-poo hurts."

When interviewed, Ashley, then four years old, said that Big Gregory was "licking everybody's stomach" and that he would lick Ms. B.'s breasts. She also used sexually explicit adult language when describing Big Gregory's conduct. During his interview, Gregory, then nine years old, again demonstrated the "horsie" game and said that Ashley had touched his "private parts" but he only had touched her through her clothing. When asked where he had learned such behavior, he stated that he had observed Ms. B. and Big Gregory having sex in a hotel room in which the two adults and four children were staying.

Matthew, who was seven years old at the time, denied that he had been sexually abused, but told the social worker that he had seen Gregory touching "Lae–Lae's [Laione's] poo-poo" and her "butt" with his hand and mouth. He also stated that when he told his mother what he had witnessed, she "whipped" Gregory and Laione. Gregory later told Matthew

that Ms. B. had said "not to tell our business." Matthew told the social worker about dreaming that something would come down from the sky and take him away. He also talked about an imaginary "bad" brother, whom he referred to as "Invisible Gregory." After the interview ended, the social worker found Matthew crouching behind a door in the waiting room, claiming that "Invisible Gregory" had taken money from his pocket.

When Ms. B. was informed of the children's statements, she stated that she was not surprised about the sexual activity between them, because Matthew had informed her about it and that she told them that it was inappropriate. She also acknowledged that there was "an episode when the children walked in on her having sex" and "a time when Laione walked in and saw her performing fellatio on Monte."

On April 23, 2002, the Circuit Court for Montgomery County, sitting as the juvenile court, held an emergency shelter care [4] hearing and committed the children to the Department for foster care placement. Ms. B. agreed to drop off medication for Matthew the following day, but did not do so, and also failed to give the Department forms so they could access the children's medical records.

Subsequently, based on allegations of fact derived from the children's interviews, the Department filed Child In Need of Assistance ("CINA") [5] petitions for all four children. The

---

**4.** Shelter care "means a temporary placement of a child outside of the home at any time before disposition." Md.Code (1973, 2002 Repl.Vol.), § 3–801(w) of the Courts and Judicial Proceedings Article. A shelter care hearing "means a hearing held before disposition to determine whether the temporary placement of the child outside the home is warranted." Md.Code (1973, 2002 Repl.Vol.), § 3–801(x) of the Courts and Judicial Proceedings Article.

**5.** Md.Code (1973, 2002 Repl.Vol.), § 3–801(f) of the Courts and Judicial Proceedings Article provides:

"Child in need of assistance" means a child who requires court intervention because:
(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

Circuit Court held adjudicatory [6] and disposition [7] hearings on May 23 and 24, 2002. The court sustained most of the factual allegations, including those allegations that Ms. B. engaged in sexual activity with Laione. The children were declared CINA and committed to the Department's continuing care for foster care placement. The court also ordered that Ms. B. be permitted supervised visitation with the children. At that point, the Department's permanency plan for the children was reunification with Ms. B.

On March 25, 2003, eleven months after the initial CINA determination, the juvenile court conducted a permanency plan review hearing pursuant to Maryland Code (1973, 2002 Repl.Vol.), Section 3-823(b)(1)(i) of the Courts and Judicial Proceedings Article.[8] At the hearing, the Department took the position that the permanency plan for the children should be changed to termination of parental rights ("TPR")/adoption. Ms. B. opposed such a change.

The Department called two witnesses: Nancy Atikkan, the Department social worker assigned to the children since Sep-

(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

6. Md.Code (1973, 2002 Repl.Vol.), § 3-801(c) of the Courts and Judicial Proceedings Article defines "adjudicatory hearing" as "a hearing under this subtitle to determine whether the allegations in the petition, other than the allegation that the child requires the court's intervention, are true."

7. Md.Code (1973, 2002 Repl.Vol.), § 3-801(m) of the Courts and Judicial Proceedings Article defines "disposition hearing" as "a hearing under this subtitle to determine: (1) Whether a child is in need of assistance; and (2) If so, the nature of the court's intervention to protect the child's health, safety, and well-being."

8. Section 3-823(b)(1)(i) of the Courts and Judicial Proceedings Article provides:
   *Permanency planning hearing.*—(1) the court shall hold a permanency planning hearing:
   (i) No later than 11 months after a child in a CINA proceeding enters an out-of-home placement to determine the permanency plan for the child committed under § 3-819(b) of this subtitle.

tember of 2002, and Polly H. Kraft, M.D., a psychiatrist who examined the children at The Reginald S. Lourie Center for Infants and Young Children ("Lourie Center"), and participated with others at that center in evaluating their emotional and mental health problems. Ms. B. did not call any witnesses. Counsel for the children participated in the hearing, but did not call any witnesses.

The evidence introduced by the Department showed that the children at first were placed in two foster homes in Montgomery County: Gregory and Matthew were together and Laione and Ashley were together. In both placements, the children were aggressive and combative with each other and destructive to property, and had to be moved to separate homes. Additionally, Laione told lies of a sexual nature and Ashley engaged in "sex talk."

In mid-May, Matthew moved to a second foster home, also in Montgomery County, where he has remained and adjusted well. The other three children went through multiple foster homes in the first few months immediately after entering shelter care and eventually were placed in therapeutic foster homes in Baltimore City through the Pressley Ridge Center. Gregory, Laione, and Ashley received therapy at the Pressley Ridge Center, and Pressley Ridge facilitated their visitations with Ms. B.

In the summer of 2002, Ms. B. moved to Baltimore City to be closer to her three children in foster care there. Weekly visits at Pressley Ridge were scheduled with all four children, with the Department providing transportation for Matthew from Montgomery County. Ms. B. then requested that the visits be scheduled bi-weekly to accommodate her work schedule.

According to the children's social worker, Ms. Atikkan, Ms. B. failed to attend the scheduled visits consistently or reliably, despite the fact that Ms. B. lived within walking distance of the Pressley Ridge Center. When she would participate in visits with all of the children, the children ran around and interacted aggressively with each other while Ms. B. exercised

little to no control over their behavior. As a result, the visits were subsequently scheduled individually, on alternating weeks, with Matthew's visits occurring in Montgomery County. Ms. B. continued to miss a significant number of the scheduled visits and to be late for others. During part of the time period in which the visits were scheduled on alternating weeks, Ms. B. was working in Takoma Park; however, when she lost her job and became unemployed, she did not schedule any additional visits and continued to either miss or be late for visits. The Department recommended that Ms. B. undergo a psychological evaluation. Ms. B., however, did not submit to one.

Dr. Kraft, the psychiatrist who examined the children at The Reginald S. Lourie Center for Infants and Young Children, testified about the evaluation of the children performed by the Lourie Center in the summer of 2002, and the children's mental health issues. The evaluation was conducted by a team of therapists, including Dr. Kraft, and covered a period of forty to fifty hours. It included an interview with Ms. B., individual sessions with the children, sessions with the children and Ms. B., and sessions with the foster parents, and psychological testing of the children.

Dr. Kraft conducted the interview of Ms. B., who vocalized her belief that the children's problems were the result of mistreatment by the child welfare system. She angrily insisted that the children were not being cared for properly and claimed that the children were perfectly normal prior to their removal from her care. She refused to acknowledge that she was responsible for their problems. Dr. Kraft concluded that the children's emotional and mental problems were the result of long-term abuse, most likely occurring throughout their lives, which could not have been caused solely by their removal from their mother's custody. In Dr. Kraft's opinion, Ms. B.'s ability to properly socialize the children and keep them safe was "severely impaired."

According to Dr. Kraft, Gregory, Laione, and Ashley had suffered severe emotional damage as a result of physical and

sexual abuse in their mother's home. Each of the children was diagnosed with mental illnesses as a consequence. Gregory's ability to trust others was damaged to the extent that he exhibited deviant anti-social behavior, including lying, stealing, and attempting to trick people. Ashley was the most seriously emotionally damaged, to such a degree that the evaluators first believed that she was psychotic. She engaged in sexualized and inappropriate behavior that included making an overt sexual advance to one of the interviewing therapists.

Laione also suffered severe personality damage, marked by a very low sense of self-esteem. She sexualized all relationships and resorted to sexual self-stimulation when experiencing stress. Matthew was the only child who suffered moderate, rather than serious, emotional damage, exhibited mainly through anxiety. Dr. Kraft stated that all of the children would need to be "resocialized."

At the conclusion of the hearing, the court determined that the permanency plan would remain reunification, stating, "I do not think TPR is yet appropriate." The court noted that some of the problems with Ms. B.'s failure to attend visits could have been caused by distance and that it was necessary that Ms. B. undergo a psychological evaluation. Moreover, the court stated that, without an evaluation, the appropriate plan for the children could not be determined. The judge explained:

> So, I want to make it clear by saying it a third time, that the mother must participate in this psychological evaluation, in which she tells the evaluator what happened in her childhood and what happened in the lives of the children while they were with her that may be significant, so we can look to what has to be done to reunify the children.

> I do not think we've had a full enough opportunity to do that. That's why I can't approve today a Permanency Plan of Termination of Parental Rights. I do not think we've had enough opportunity on behalf of the mother for that to be an appropriate Plan. . . .

The court ordered that the psychological evaluation of Ms. B. be performed within thirty days.

A second permanency planning review hearing was held on October 1, 2003. The Department once again requested that the permanency plan be changed to TPR/adoption, and Ms. B. again opposed that request. During the approximately six months between the first and second permanency plan review hearings, Dr. Michael Gelles, performed a psychological evaluation of Ms. B.

During the hearing, the Department called Dr. Gelles and Ms. Atikkan as witnesses. Counsel for the children called Shelby Morgan, Ph.D., Gregory and Laione's therapist at Pressley Ridge, and the supervisor for Ashley's therapist at Pressley Ridge. Ms. B. testified on her own behalf. Also present were Joanna Duncan, a Community Services Aide, Josie Traum, the children's former social worker, and Charley Mathews, a social worker who supervises the Sex Abuse Treatment division, all of whom were employed by the Department.

The Department introduced a ninety-nine page report which included a calendar containing entries indicating when Ms. B. had failed to attend visits, a discharge summary from Shepard Pratt for Gregory, and writings by the children. Ms. B. objected to the admission of the report as impermissible hearsay and objected to opinion testimony from Ms. Atikkan, the children's social worker. She also requested that the other people who had been identified as witnesses be excluded from the courtroom during Dr. Gelles's testimony pursuant to Maryland Rule 5–615,[9] and that the courtroom be cleared of all members of the general public, but the court denied her requests. In addition, the court denied Ms. B.'s objections stating that a permanency planning hearing is a "species of"

---

9. Md. Rule 5–615 provides in pertinent part:
   (A) **In general.** . . . upon the request of a party made before testimony begins, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses.

disposition hearing under Maryland Rules 5–101(c)[10] and 11–115,[11] and thus, application of the Maryland Rules of evidence was discretionary outside of the context of competency of witnesses.

Dr. Gelles, the psychologist who evaluated Ms. B., testified that, prior to conducting the evaluation, he reviewed docu-

**10.** Md. Rule 5–101(c) provides:
> (c) **Discretionary application.** In the following proceedings, the court may, in the interest of justice, decline to require strict application of the rules in this Title other than those relating to the competency of witnesses:
> (1) The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 5–104(a);
> (2) Proceedings for revocation of probation under Rule 4–347;
> (3) Hearings on petitions for post-conviction relief under Rule 4–406;
> (4) Plenary proceedings in the Orphans' Court under Rule 6–462;
> (5) Waiver hearings under Rule 11–113;
> (6) Disposition hearings under Rule 11–115;
> (7) Modification hearings under Rule 11–116; and
> (8) Any other proceeding in which, prior to the adoption of the rules in this Title, the court was authorized to decline to apply the common-law rules of evidence.

**11.** Maryland Rule 11–115 provides in pertinent part:
> a. **Hearing–Scheduling.** If after an adjudicatory hearing the court determines that the allegations of the petition at issue in the adjudicatory hearing have been sustained, it shall promptly schedule a separate disposition hearing. The disposition hearing shall be held no later than thirty days after the conclusion of the adjudicatory hearing.
>
>       *      *      *
>
> d. **Commitment to Department of Social Services.** In cases in which a child is committed to a local department of social services for placement outside the child's home, the court, within 18 months after the original placement and periodically thereafter at intervals not greater than 18 months, shall conduct a review hearing to determine whether and under that circumstances the child's commitment to the local department of social services should continue. Considerations pertinent to the determination include whether the child should (1) be returned home, (2) be continued in foster care for a specified period, (3) be placed for adoption, or (4) because of the child's special needs or circumstances, be continued in foster care on a permanent or long-term basis. The hearing shall be conducted as prescribed in Rule 11–110 or, if conducted by a master, as prescribed in Rule 11–111, except that the child's presence shall not be required if presence at the hearing is likely to cause serious physical, mental, or emotional harm to the child.

ments related to her and to the children, including an intake evaluation of Ms. B. by a social services agency in Montgomery County, in September of 2001. He interviewed Ms. B. for approximately two and one half hours and administered a variety of psychological tests. Based upon all of the information at his disposal, Dr. Gelles concluded that Ms. B. did not have a major psychological condition, but manifested a minor to moderate personality disorder characterized by passive, aggressive, and avoidance traits that negatively impact her behavior.

Dr. Gelles found Ms. B. to have difficulty being consistent and reliable, as a person and therefore, as a parent. She told people what she wanted them to hear to portray herself in the manner in which she wanted to be seen. As an example, Dr. Gelles informed the court about lies that Ms. B. had told in order to obtain housing assistance, including that as a child she was sexually abused by a relative and had witnessed a murder. Dr. Gelles concluded that Ms. B.'s pervasive unreliability and extreme need to please others resulted in others distrusting what she said and only basing their judgments on her actions.

Ms. B. told Dr. Gelles that none of the abuse reported by the children as having occurred in her household had happened. She continued in her denial even when shown a letter written by Laione during therapy which detailed Ms. B.'s sexual relations with her. Ms. B.'s reaction was that the letter might have been written by someone else or that someone had influenced Laione to write it. Ms. B. was angry with the Department and blamed it for the children's problems. Dr. Gelles testified that Ms. B. lacked any real understanding about how her past behavior had impacted her children, as evidenced by Ms. B.'s defensiveness and denial. At the close of Dr. Gelles's testimony, the Department stated that it did not intend to call Ms. Duncan, Ms. Traum, or Mr. Mathews as witnesses.

Ms. Atikkan testified that the children had been in foster care for sixteen months and that during that time Ms. B.

failed to comply with the service agreements. Ms. B. had not participated in parenting classes which were offered to her, had not consistently signed releases for medical treatment for the children, and had not consistently attended visitation with the children. During sixty-eight weeks of visitation, she had seen Gregory twenty-six weeks, Matthew fourteen weeks, Laione twenty-one weeks, and Ashley eighteen weeks. Ms. B. also did not attend school meetings for the children and changed jobs several times since September of 2002.

Ms. Atikkan also explained that Ms. B. refused to acknowledge the abuse that had occurred in her household, and therefore, failed to take responsibility for it. She stated that Ms. B.'s lack of honesty in acknowledging the circumstances in which her children were sexually abused and inability to empathize with them made it difficult for the children to heal emotionally from the trauma.

After Ms. Atikkan testified, the children's attorney called Ms. Morgan, the Clinical Coordinator for Pressley Ridge, to testify. Ms. Morgan is a therapist who specializes in treating children who have been sexually abused. She began treating Laione in September of 2002 and testified that at that time Laione would engage in sexual talk during therapy and exhibit sexualized behavior at school and in her foster home. Laione would touch other children sexually at school, would ask her foster mother to have sex with her, and would become angry and intentionally wet the bed when her foster mother refused.

Ms. Morgan stated that through therapy Laione made progress and developed a sense of trust over the preceding year. Laione disclosed more sexual abuse during that time, including abuse by Ms. B. Ms. Morgan worked with Laione to control her sexual thoughts and dreams, by labeling them the "sex monster," and by writing about her feelings in a journal. When Ms. Morgan discussed Laione's problems with Ms. B., Ms. B. acknowledged that Laione had been sexually abused, but claimed that she did not know the identity of the perpetrator.

Gregory began meeting with Ms. Morgan in April of 2003, after his first counselor left Pressley Ridge. According to Ms. Morgan, in the beginning, Gregory had difficulty expressing any feelings, but eventually began to talk about his anger. He has engaged in bizarre behavior at his foster home, such as defecating in a potato bag, which he said that he did because he was angry. According to Ms. Morgan, Gregory has problems with lying, stealing, and trusting adults.

Ms. Morgan stated that, although Ms. B. does have some skills in dealing with the children, she is inconsistent, unreliable, and unable to keep them safe outside of a highly structured and protective treatment environment. Responding to questions posed by the court, Ms. Morgan observed that Laione had experienced anger when her mother failed to attend a scheduled visit, and at one time wrote a letter to her mother expressing her feelings. Laione also would experience a large amount of anxiety after meeting with Ms. B. Gregory, however, responded to his mother's absence with stated indifference.

As the last witness, Ms. B. testified on her own behalf. She stated that she never engaged in sexual abuse of her children and that, to her knowledge, they were not sexually abused in her home. The court then ruled from the bench, granting the Department's petition to change the permanency plan. It found that the Department had made reasonable efforts to reunify Ms. B. with her children and that Ms. B.'s testimony was replete with hollow empathy and "sophistry." The same day, the court issued written orders changing the children's permanency plans to TPR/adoption.

On October 31, 2003, Ms. B. noted her appeal to the Court of Special Appeals, asking the following questions:

I. Did the juvenile court err by denying [Ms. B.'s] motion to sequester witnesses and otherwise failing to strictly apply the Maryland Rules of Evidence in the permanency plan review hearing?

II. Did the juvenile court err by refusing to exclude nonparties from the courtroom?

III. Did the juvenile court err in changing the children's permanency plans from reunification to adoption when the evidence was insufficient to show that the Department had made reasonable efforts to reunify [Ms. B.] with the children?

In a reported opinion, *In re Ashley E.,* 158 Md.App. 144, 854 A.2d 893 (2004), the Court of Special Appeals upheld the decision to change the permanency plan from reunification to TPR/adoption and agreed with the Circuit Court's determination that a permanency planning hearing is a kind of disposition hearing because at such a hearing the court is determining the appropriate actions that the court should take and reviewing the permanency plan established at the original disposition hearing. Therefore, the Court of Special Appeals concluded that the Rules do not mandate the application of the Rules of Evidence during the hearing. Because the application of the Rules of Evidence was discretionary, the court held that the Circuit Court was not bound to apply Maryland Rule 5–615(a), and thus, was not required to order the exclusion of witnesses when asked to do so prior to the first witness's testimony. Moreover, the Court of Special Appeals held that the Circuit Court's decision to permit certain employees of the Department to remain in the courtroom during the hearing did not constitute good cause for overturning the court's decision because Ms. B. could not show both error and prejudice.

Ms. B. filed a petition for writ of certiorari with this Court on September 1, 2004, presenting two issues for our consideration:

1. Whether the Maryland Rules of Evidence should be strictly applied in a permanency planning hearing and the subsequent hearings to review the permanency plan when such hearings are separate and distinct from disposition hearings under Rule 11–115, are meant to accomplish more than simply modify the dispositional order under Rule 11–116, and were created by statute in 1998, subsequent to the adoption of the rules of evidence, such that the court could not have been author-

ized to decline to apply the common-law rules of evidence in these hearings.

2. Whether all non-parties must be excluded from the courtroom pursuant to Courts and Judicial Proceedings Section 3–810(b)(2) when the proceedings were concerning confidential information from the child abuse report and record and the mere presence of the non-parties caused the natural parent's right to confidentiality to be breached.

On November 12, 2004, we granted the petition and issued the writ of certiorari. *In re Ashley E.*, 383 Md. 569, 861 A.2d 60 (2004). Because we find that permanency planning hearings are dispositional in nature and may properly be characterized as hearings governed by Rule 11–115d., we hold that the juvenile court was not required to apply the Rules of Evidence during a permanency planning hearing.[12] Moreover, we conclude that the juvenile court did not err in failing to exclude the Department's employees who were no longer directly involved in the case under Section 3–810 of the Courts and Judicial Proceedings Article because their presence did not destroy the confidential nature of the proceedings due to their prior knowledge.

## Discussion

On December 15, 1993, this Court adopted Title 5 of the Maryland Rules governing the admission of evidence during judicial proceedings. Md. Reg. vol. 21, at 1 (Jan. 7, 1994). At that time, we approved Rule 5–101, "Scope," which stated:

---

**12.** Rule 5–101(c)(8) lists "[d]isposition hearings under Rule 11–115" as proceedings in which the court "may in the interest of justice, decline to require strict application" of the Rules of Evidence. Because the review hearings mandated under Rule 11–115d. require the court to assess the historical circumstances supporting the original disposition order, as well as any subsequent developments, and determine "the nature of the court's intervention to protect the child's health, safety, and well-being," Md.Code (1973, 2002 Repl.Vol.), § 3–801(m)(2) of the Courts and Judicial Proceedings Article, which is the purpose of the initial disposition hearing, Rule 5–101(c)(8) may properly be interpreted as including disposition review hearings under Rule 11–115d. within its purview. To determine otherwise would produce an absurd result.

(a) **Generally.** Except as otherwise provided by statute or rule, the rules in this Title apply to all actions and proceedings in the courts of this State.

(b) **Rules inapplicable.** The rules in this Title other than those relating to the competency of witnesses do not apply to the following proceedings:

(1) Proceedings before grand juries;

(2) Proceedings for extradition or rendition;

(3) Direct contempt proceedings in which the court may act summarily;

(4) Small claim actions under Rule 3–701 and appeals under rule 7–112(c)(2);

(5) Issuance of a summons or warrant under Rule 4–212;

(6) Pretrial release under Rule 4–216 or release after conviction under Rule 4–349;

(7) Preliminary hearings under Rule 4–221;

(8) Post-sentencing procedures under Rule 4–340;

(9) Sentencing in non-capital cases under Rule 4–342;

(10) Issuance of a search warrant under Rule 4–601;

(11) Detention and shelter care hearings under Rule 912; and

(12) Any other proceeding in which, prior to the adoption of the rules in this Title, the court was traditionally not bound by the common-law rules of evidence.

(c) **Discretionary application.** In the following proceedings, the court may, in the interest of justice, decline to require strict application of the rules of evidence in this Title other than those relating to the competency of witnesses:

(1) The determination of questions of fact preliminary to admissibility of evidence when the issue to be determined by the court under Rule 5–104(a);

(2) Proceedings for revocation of probation under Rule 4–347;

(3) Hearings on petitions for post-conviction relief under Rule 4–406;

(4) Plenary proceedings in the Orphans' Court under Rule 6–462;

(5) Waiver hearings under Rule 913;

(6) Disposition hearings under Rule 915;

(7) Modification hearings under Rule 916; and

(8) Any other proceeding in which, prior to the adoption of the rules in this Title, the court was authorized to decline to apply the common-law rules of evidence.

Md. Rule 5–101 (1994). Rule 5–101 was amended in 1996 to conform to the new numbering scheme of the Maryland Rules. Md. Rule 5–101 (1997). The Rule had not been altered substantively until April 5, 2005, when we adopted the recommended amendment to the Rule to align its provisions with the newly promulgated Title 15, Chapter 1100 of the Rules, which govern catastrophic health emergency proceedings. Md. Reg. vol. 32, at 279 (Feb. 4, 2005); Rules Order (Apr. 5, 2005).[13]

Maryland Rule 5–101(c) permits a court to "decline to require the strict application of the rules" in various proceedings including "[d]isposition hearings under Rule 11–115" Md. Rule 5–101(c). When discussing Rule 5–101(c), the Rules Committee considered various phrases including: "relax the application of the rules of evidence"; "decline to apply as justice may require"; "decline to apply certain rules of evidence"; and "decline to apply the rules of evidence strictly." Minutes of the Standing Committee on Rules of Practice and Procedure Meeting, June 19, 1992, at 47. Ultimately, the Rules Committee recommended the language presently contained in subsection (c). *Id.* The Chairman of the Committee, the Honorable Alan M. Wilner, now a Judge on this Court, noted that the adopted language "clearly allows the application of some rules and not others." *Id.* at 48. Based upon the Rules Committee's discussion, "decline to require strict appli-

---

13. This Court's Rules Order of April 5, 2005 designated "catastrophic health emergency proceedings under Title 15, Chapter 1100" as a proceeding in which the application of the Rules of Evidence may be relaxed in the interests of justice.

cation of the rules" appears to have been intended to mean that the application of the various rules of evidence in a proceeding listed in subsection (c) is entrusted to the discretion of the court.

This conclusion is consistent with the structure of Rule 5–101. Rule 5–101 delineates three different categories of proceedings depending upon the application of the Rules of Evidence identified. Subsection (a) provides the general rule that the Rules of Evidence apply to "all actions and proceedings in the courts of this State," subject to certain exceptions. Md. Rule 5–101(a). Subsection (b) lists those proceedings in which the Rules of Evidence do not apply, except "those relating to the competency of witnesses." Md. Rule 5–101(b). Finally, subsection (c), entitled "Discretionary application," prescribes proceedings in which the court, in its discretion, may decline to apply the Rules of Evidence. Md. Rule 5–101(c). Therefore, it is clear that the phrase "decline to require strict application" means that the application of the Rules of Evidence is not mandatory with respect to those proceedings listed in subsection (c), and in this context "strict" is synonymous with "mandatory."

Ms. B. argues that the application of the Rules of Evidence in permanency planning hearings is mandatory because such hearings cannot be categorized as any of the proceedings listed in Maryland Rule 5–101(c). Ms. B. notes that the only possible categories applicable to permanency planning hearings under Rule 5–101(c) are either disposition hearings under Maryland Rule 11–115 or modification hearings under Maryland Rule 11–116. She distinguishes permanency planning hearings held under Section 3–823 of the Courts and Judicial Proceedings Article [14] from disposition review hearings de-

---

**14.** Md.Code (1973, 2002 Repl.Vol.), § 3–823 of the Courts and Judicial Proceedings Article states in pertinent part:

(b) *Permanency planning hearing.*—(1) The court shall hold a permanency planning hearing:

(i) No later than 11 months after a child in a CINA proceeding enters an out-of home placement to determine the permanency plan for the

scribed under Maryland Rule 11–115d. on the basis of their applicable time periods. Ms. B. also asserts that permanency planning hearings are not modification hearings under Maryland Rule 11–116 [15] because permanency planning hearings are

---

child committed under § 3–819(b) [Disposition hearings] of this subtitle; or

(ii) Within 30 days after the court finds that reasonable efforts to reunify a child with the child's parent or guardian are not required based on a finding that a circumstance enumerated in § 3–812 of this subtitle has occurred.

\* \* \*

(e) *Determinations to be made at hearing.*—At a permanency planning hearing, the court shall:

(1) Determine the child's permanency plan, which may be:

(i) Reunification with the parent or guardian;

(ii) Placement with a relative for:

1. Adoption; or

2.Custody and guardianship;

(iii) Adoption by a nonrelative;

(iv) Guardianship by a nonrelative;

(v) Continuation in a specified placement on a permanent basis because of the child's special needs or circumstances;

(vi) Continuation in placement for a specified period because of the child's special needs or circumstances; or

(vii) Independent living . . .

(h) *Periodic reviews.*—(1)(i) Except as provided in subparagraphs (ii) and (iii) of this paragraph, the court shall conduct a hearing to review the permanency plan at least every six months until commitment is rescinded.

15. Maryland Rule 11–116 provides in pertinent part:

a. **Revisory power.** An order of the court may be modified or vacated if the court finds that action to be in the best interest of the child or the public, except in cases involving commitment of a child to the Department of Health and Mental Hygiene for placement in a State mental hospital.

\* \* \*

c. **Hearing—When required.** If the relief sought under section a of this Rule is for revocation of probation and for the commitment of a respondent, the court shall pass an order to show cause why the relief should not be granted and setting a date and time for a hearing. The clerk shall cause a copy of the petition and Show Cause Order to be served upon the parties. In all other cases, the court may grant or deny the relief, in whole or in part, without a hearing.

d. **Conduct of hearing.** In the interest of justice, at any hearing held pursuant to this Rule the court may decline to require strict application of the rules in Title 5, except those relating to the competency of witnesses.

not intended solely to modify the dispositional order. Ms. B. characterizes the result of a permanency planning order as a new order based on new factual findings rather than one modifying the original order.[16]

Ms. B. also argues that because Ms. Traum, Ms. Duncan, and Mr. Mathews were not witnesses or the designated representatives of the Department, they should have been excluded as members of the general public from a confidential proceeding concerning child abuse under Maryland Code (1973, 2002 Repl.Vol.), Section 3–810 of the Courts and Judicial Proceedings Article.[17] She asserts that exclusion was mandatory, and that because of the nature of the underlying issues and purpose of the applicable statute, the failure to exclude should not be considered harmless error.

Conversely, the Department argues that a permanency planning hearing is dispositional, and as such, the application of the Rules of Evidence is not mandatory. In short, the Department asserts that the juvenile court may decide which Rules should apply. The Department notes that the determi-

---

**16.** Ms. B. also contends that, because the Maryland Rules of Evidence must be applied to the permanency planning hearing, it was error for the court to deny her motion to sequester the witnesses under Maryland Rule 5–615. Moreover, Ms. B. argues that this error was not harmless because the testimony of Ms. Atikkan and Ms. Morgan was influenced by Dr. Gelles's prior testimony and that the court was "undoubtedly convinced" that Ms. B. was not a capable parent for the children, and thus changed the permanency plan to TPR/adoption.

**17.** Section 3–810 provides in pertinent part:

(b) *Confidentiality; exclusion of general public.*—(1) In any proceedings in which a child is alleged to be in need of assistance, the court may exclude the general public from a hearing and only admit those persons having a direct interest in the proceeding and their representatives.

(2) The court shall exclude the general public from a hearing where the proceedings involve discussion of confidential information from the child abuse and neglect report and record, or any information obtained from the child welfare agency concerning a child or family who is receiving Title IV–B child welfare services or Title IV–E foster care or adoption assistance.

Md.Code (1973, 2002 Repl.Vol.), § 3–810(b) of the Courts and Judicial Proceedings Article.

nations made at a permanency planning hearing are virtually identical to those listed in Rule 11–115d. and that certain evidence may be considered by the court in permanency planning hearings that otherwise would not be admissible. According to the Department, because permanency planning hearings are properly considered disposition hearings, "strict application" of the Rules of Evidence is not necessary, and the court did not abuse its discretion in declining to do so.

The Department also asserts that Ms. Traum, Ms. Duncan, and Mr. Mathews cannot properly be considered members of the general public because all are employees of the Department, were involved in the case, and had access to the confidential information at issue. Therefore, the Department states that it was not error for the court to decline to exclude them from the hearing.

## Disposition Hearings Under Maryland Rule 11–115

In 1969, the Rules Committee formulated, and the Court adopted, Maryland Rule 913 to govern the conduct of disposition hearings in juvenile causes. Minutes of the Standing Committee on Rules of Practice and Procedure Meeting, June 31, 1969. The draft version of Maryland Rule 913 stated:

Rule 913.  Disposition Hearing

a.  Conduct of the Hearing

1.  By Judge or Master.  The judge or master who presided at the adjudicatory hearing shall, wherever possible, preside at the disposition hearing.

2.  Availability of Social Study Report.  Any social study report made available to the court at the hearing shall be made available to the parties before the court or their counsel, if any.

b.  Disposition of Case. The disposition of the case shall be entered on the docket by the clerk.  Each commitment shall be made subject to the further order of the court. If the disposition order includes placement of the child out side his home, the court shall announce and dictate to the court stenographer or reporter or prepare and file

with the clerk a brief statement of the reasons why such placement is necessary.

Md. Rule 913 (draft, 1969); Md. Rule 913 (1970). In 1975, in response to a new statewide juvenile code enacted by the General Assembly, Rule 913 was amended to include a reference to Section 3–820(b) of the Courts Article and renumbered as Rule 915. Forty–Ninth Report of the Standing Committee on Rules of Practice and Procedure, at 1 (June 3, 1975); Md. Rule 915 (effective 1977). Amended Rule 915 stated:

a. *Hearing—Scheduling.*

If after an adjudicatory hearing the court determines that the allegations of the petition at issue in the adjudicatory hearing have been sustained, it shall promptly schedule a separate disposition hearing. The disposition hearing shall be held no later than thirty days after the conclusion of the adjudicatory hearing.

b. *Disposition—Judge or Master.*

The disposition made by the court shall be in accordance with Section 3–820(b) of the Courts Article. If the disposition hearing is conducted by a judge, and his order includes placement of the child outside the home, the judge shall announce in open court and on the record or shall prepare and file with the clerk, a statement of the reasons why the placement is necessary. If the hearing is conducted by a master, the procedures of Rule 911 [present Rule 11–111] shall be followed. A commitment recommended by a master is subject to approval by the court in accordance with Rule 911 [present Rule 11–111], but may be implemented in advance of court approval.

Md. Rule 915 (1980). Three years later, Rule 915 was amended again to include section c., defining the procedures for placing a juvenile in a State mental hospital. Md. Rule 915c. (1981).

In 1983, the last substantive change, the addition of section d., was made to Rule 915. That Section provided:

d. *Commitment to Department of Social Services.*

In cases in which a child is committed to a local department of social services for placement outside the child's home, the court, within 18 months after the original placement and periodically thereafter at intervals not greater than 18 months, shall conduct a review hearing to determine whether and under what circumstances the child's commitment to the local department of social services should continue. Considerations pertinent to the determination include whether the child should (1) be returned home, (2) be continued in foster care for a specified period, (3) be placed for adoption, or (4) because of the child's special needs or circumstances, be continued in foster care on a permanent or long-term basis. The hearing shall be conducted as prescribed in Rule 911, except that the child's presence shall not be required if presence at the hearing is likely to cause serious physical, mental, or emotional harm to the child.

Md. Rule 915d. (1984). In 1996, this Court issued an order, effective January 1, 1997, which renumbered Rule 915 as Rule 11–115. Section d. was not substantively changed. Md. Rule 11–115 (1997).

When section d. was presented by the Rules Committee, it was accompanied by the following explanatory note:

The proposed addition to Rule 915 [present Rule 11–115] has been drafted in response to the requirements of a federal foster care and child welfare statute (P.L. 96–272) which requires states receiving federal assistance for foster care and child welfare services to provide procedural safeguards for the review of the status of and planning for children in foster care (i.e. children committed to local departments of social services for placement outside their homes). The proposed rule change is also responsive to the recommendation made by the Office of the Attorney General after reviewing the federal statute and consulting with local departments of social services, foster care review board staff, and members of the judiciary.

Proposed section (d) of Rule 915 [present Rule 11–115] will require juvenile courts, at intervals of no greater than 18 months, to hear and review each case of a child who has

been committed to a local department of social services for placement outside the child's home. In virtually the exact language as the federal act, the rule amendment clarifies that the purpose of the hearing is to determine the future status of the child including whether the child should be returned home, continued in foster care for a specified period, placed for adoption, or continued in foster care on a permanent or long-term basis because of the child's special needs or circumstances.

In addition, in partial response to the concern of the Family Law and Procedure Committee of the Maryland Judicial Conference and the recommendation of the Office of the Attorney General, proposed section (d) provides that the child is not required to attend the review hearing if presence at the hearing would be likely to cause serious physical, mental, or emotional harm to the child.

Minutes of the Standing Committee on Rules of Practice and Procedure Meeting, May 20–21, 1983, at 48–49.

### Permanency Plans in CINA Proceedings

In response to concerns that children were being lost in the foster care system without belonging to a permanent family, Congress enacted Public Law 96–272, the "Adoption Assistance and Child Welfare Act of 1980," codified at 42 U.S.C. §§ 670–679 (1988), and the Federal Adoption and Safe Families Act of 1997, P.L. 105–89, codified at 42 U.S.C. §§ 673b, 678, 679b (2000), which required states, among other things, to "provide a written case plan for each child for whom the state claims federal foster care maintenance payments." 42 U.S.C. § 671(a)(16); *see also In re Samone H. & Marchay E.,* 385 Md. 282, 869 A.2d 370 (2005); *In re Yve S.,* 373 Md. 551, 574–75, 819 A.2d 1030, 1044 (2003). Pursuant to Congress's condition for federal funding, Maryland created a statutory scheme directing the Department of Social Services to "develop and implement a permanency plan that [was] in the best interests" of those children committed to the local department of social services. *In re Samone H.,* 385 Md. at 301, 869 A.2d at 381; *In re Yve S.,* 373 Md. at 574, 819 A.2d at 1044, quoting *In re*

*Adoption/Guardianship No. 10941*, 335 Md. 99, 103–06, 642 A.2d 201, 203–05 (1994); Md.Code (1984, 1999 Repl.Vol., 2002 Cum.Supp.), § 5–525(e) of the Family Law Article. In *In re Damon M.*, 362 Md. 429, 765 A.2d 624 (2001) we identified the importance of a permanency plan:

> The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement. It provides the goal toward which the parties and the court are committed to work. It sets the tone for the parties and the court and, indeed, may be outcome determinative. Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan. And, because it may not be changed without the court first determining that it is in the child's best interest to do so, the permanency plan must be in the child's best interest. These are the reasons, no doubt, that the court is charged with determining the plan and with periodically reviewing it, evaluating all the while the extent to which it is being complied with.

362 Md. at 436, 765 A.2d at 627–28. Most recently, in *In re Samone H.*, we explained the need for trial courts to review permanency plans to ensure that children are being cared for in the best possible manner:

> As *In re Damon M.* observes, the purpose of a permanency plan is to set the direction in which the parent, agencies, and the court will work in terms of reaching a satisfactory conclusion to the situation. Once set initially, the goal of the permanency plan is re-visited periodically at hearings to determine progress and whether, due to historical and contemporary circumstances, that goal should be changed. It is not the purpose of the initial permanency plan hearing, however, to resolve all issues involved in that final resolution. If that were the case, there would be no need for review of how, on a regular basis, the plan is progressing or not. Also as *In re Damon M.* indicates, the initial permanency plan hearing is to be held and conducted expeditious-

ly. Protracted proceedings in establishing the initial plan defeat the purpose of the statute. The statute presumes that, unless there are compelling circumstances to the contrary, the plan should be to work toward reunification, as it is presumed that it is in the best interest of a child to be returned to his or her natural parent.

385 Md. at 302, 869 A.2d at 382, quoting *In re Yve S.*, 373 Md. at 582, 819 A.2d at 1049.

In *In re Samone H.*, quoting from *In re Yve S.*, we also delineated the requirements a trial court must follow when implementing a permanency plan:

[T]he court has the responsibility for determining the permanency plan, § 3–826.1(a)(1) and justifying the placement of children in out of home placements for a specified period or on a long-term or permanent basis, § 3–826.1(d), in addition to conducting periodic, six month reviews. § 3–826.1(f).

\* \* \*

Section 3–826.1 [now codified as Section 3–823 of the Courts and Judicial Proceedings Article] requires the court, not later than 11 months after a child found to be in need of assistance has been placed in foster care, see also Md.Code (1989, 1991 Repl.Vol., 1997 Cum.Supp.) § 501(m) of the Family Law Article, to hold a permanency planning hearing to determine the permanency plan for that child. § 3–826.1(a)(1) [now § 3–823(b)(1)]. At that hearing, for each child in placement and in determining the plan, the court is required to make certain decisions and findings, § 3–826.1(c), [now § 3–823(e)] specifically, whether the child should be: returned to the parent or guardian, § 3–826.1(c)(1)(i) [now § 3–823(e)(1)(i)]; placed with relatives to whom adoption or guardianship is granted, § 3–826.1(c)(1)(ii) [now § 3–823(e)(1)(ii)]; placed for adoption, § 3–826.1(c)(1)(iii) [now § 3–823(e)(1)(iii)]; emancipated, § 3–826.1(c)(1)(iv) [now deleted]; or because of the child's special needs or circumstances, continued in placement on a permanent or long-term basis or for a specified period, § 3–

826.1(c)(1)(v) and (vi) [now § 3–823(e)(1)(v) and (vi)]. There are restrictions on the court's ability to continue a child in placement because of the child's special needs or circumstances. § 3–826.1(d) [now § 3–823(f)]. That section prohibits the court from using that option unless it finds that the agency to which the child is committed has documented a compelling reason for determining that it would not be in the best interest of the child to:

(1) Return home;

(2) Be referred for termination of parental rights; or

(3) Be placed for adoption or guardianship with a specified and appropriate relative or legal guardian willing to care for the child.

385 Md. at 302–03, 869 A.2d at 382, quoting *In re Yve S.*, 373 Md. at 577–81, 819 A.2d at 1046–48 (additions in original). We explained:

Section 3–826.1(f) [now § 3–823(h)] mandates periodic reviews of the permanency plan by the court. Subsection (f)(1)(i) provides [now § 3–823(h)(1)(i)] that such reviews will be "no less frequently than every six months until commitment is rescinded." If, however, at the permanency planning hearing or a subsequent review hearing, the court, inter alia, orders a child continued in permanent foster care, the court is no longer required to hold the review hearings at six month intervals. Subsection (f)(1)(ii) [now § 3–823(h)(1)(ii), is revised to require review hearings every 12 months]. As is true of the initial permanency planning hearing, the court must make some determinations at the hearing to review the permanency plan. § 3–826.1(f)(2) [now § 3–823(h)(2)]. Among other things, in addition to determining whether the commitment remains necessary and appropriate, subsection (f)(2)(i) [now § 3–823(h)(2)(i)], and evaluating the progress made toward alleviating or mitigating the causes of the commitment, subsection (f)(2)(iii) [now § 3–823(h)(2)(iii)], the court is required to "determine the extent of compliance with the permanency plan," Subsection (f)(2)(ii) [now § 3–823(h)(2)(ii)], and to change it "if a change

in the permanency plan would be in the child's best interest." Subsection (f)(2)(v) [now § 3–823(h)(2)(vi)].

*In re Samone H.,* 385 Md. at 304–05, 869 A.2d at 383, quoting *In re Yve S.,* 373 Md. at 581, 819 A.2d at 1048 (additions in original).

### The Relationship Between Rule 11–115d. and Section 3–823 of the Courts and Judicial Proceedings Article

■ Ms. B. argues that review hearings under Rule 11–115d. are distinct from permanency planning hearings under Section 3–823 of the Courts and Judicial Proceedings Article, and therefore, under Rule 5–101, the juvenile court is required to strictly apply the Rules of Evidence in permanency planning hearings. To that end, she notes the differing time intervals for holding hearings under the two provisions [18] and the fact that Section 3–823 of the Courts and Judicial Proceedings Article, governing permanency planning hearings, was enacted after Rule 11–115 was last amended. She also places considerable emphasis on what she characterizes as the significantly greater number of determinations that the court must make under Section 3–823 of the Courts and Judicial Proceedings Article as compared to what the court must accomplish to comply with the requirements under Rule 11–115d. We disagree.

Both the disposition review hearings under Rule 11–115d. and the permanency planning hearings under Section 3–823 of the Courts and Judicial Proceedings Article were enacted to "provide procedural safeguards for the review of the status of

---

18. We find this distinction between the hearings held under Rule 11–115d. and Section 3–823 to be unpersuasive. Rule 11–115d. requires hearings to be held "within 18 months of the original placement and periodically thereafter at intervals not greater than 18 months." Section 3–823 of the Courts and Judicial Proceedings Article requires that the initial hearing occur no later than eleven months after the placement and periodic review hearings every six months thereafter. Md. Code (1973, 2002 Repl.Vol., 2004 Cum.Supp.), § 3–823(b)(i), (h). Obviously, the hearings mandated by Section 3–823 comply with the time limitations imposed by Rule 11–115d. Therefore, we are not persuaded that this indicates that the hearings are distinct from one another.

and planning for children in foster care (i.e. children committed to local departments of social services for placement outside their homes)." Minutes of the Standing Committee on Rules of Practice and Procedure Meeting, May 20–21, 1983, at 48; *see also In re Samone H.*, 385 Md. at 301–02, 869 A.2d at 381 (stating that the statutory scheme was enacted to insure that actions be taken in the child's best interests when committed to the Department of Social Services); *In re Yve S.*, 373 Md. at 582, 819 A.2d at 1049 (observing that "the goal of the permanency plan is re-visited periodically at hearings to determine progress and whether, due to historical and contemporary circumstances, that goal should be changed"); *In re Damon M.*, 362 Md. at 436, 765 A.2d at 627 (noting that the permanency plan is "an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement"). Moreover, the language governing the disposition review hearings in Rule 11–115d., requiring that a hearing must be held to determine "whether and under what circumstance the child's commitment to the local department should continue," reflects that the plan developed by the Department for the placement of the child is the focus of the hearing required by that Rule. Md. Rule 11–115d. This is precisely the juvenile court's task in permanency planning hearings as well. Md.Code (1973, 2002 Repl.Vol., 2004 Cum. Supp.), § 3–823(e) of the Courts and Judicial Proceedings Article. Both embody the purpose of disposition hearings: to determine "the nature of the court's intervention to protect the child's health, safety, and well-being." Md.Code (1973, 2002 Repl.Vol.), § 3–801(m)(2) of the Courts and Judicial Proceedings Article.

Furthermore, Ms. B.'s attempt to characterize Section 3–823 of the Courts and Judicial Proceedings Article and Rule 11–115d. as requiring qualitatively different determinations and considerations by the juvenile court, and therefore, mandating the conclusion that the provisions describe different proceedings, is inapposite. As stated previously, Rule 11–115d. governing disposition review hearings directs the juve-

nile court to determine whether to continue the child's commitment to the Department and also to decide the nature of that commitment. Md. Rule 11–115d. Section 3–823(h)(2) identifies criteria for deciding whether the child's commitment to the Department and the nature of the placement by the Department is appropriate:

(i) Determin[ing] the continuing necessity for and appropriateness of the commitment;

(ii) Determin[ing] the extent of compliance with the permanency plan;

(iii) Determin[ing] the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment;

(iv) Project[ing] a reasonable date by which a child in placement may be returned home, placed in a preadoptive home, or placed under a legal guardianship;

(v) Evaluat[ing] the safety of the child and tak[ing] necessary measures to protect the child; and

(vi) Chang[ing] the permanency plan if a change in the permanency plan would be in the child's best interest.

Md.Code (1973, 2002 Repl.Vol., 2004 Cum.Supp.), § 3–823(h)(2) of the Courts and Judicial Proceedings Article. Whereas Rule 11–115d. governing disposition review hearings identifies the focus of the hearing in juvenile court, the provisions of Section 3–823 of the Courts and Judicial Proceedings Article supply the details to be considered in making any decision.

Ms. B. relies on a footnote in *In re Damon M.*, in which we presented the statutory response to federal conditions, as evidence of our recognition that permanency planning hearings in CINA cases are inherently different from disposition review hearings under Rule 11–115d. In that footnote we stated:

Prior to 1998, the responsibility for developing a permanency plan for a child in foster care was entrusted to the local department of social services. Md.Code (1984, 1991 Repl. Vol., 1995 Cum.Supp.), § 5–525(c) of the Family Law Arti-

cle. Before 1996, a plan developed by the local department was reviewed by the court, together with the report and recommendation of the Foster Care Review Board, as a part of the disposition review hearing that the court was required to conduct. Md.Code (1984, 1991 Repl.Vol.), § 5–544(3) of the Family Law Article. As a result of the amendment of the Juvenile Causes Act in 1996, see Ch. 595, Laws of 1996, the juvenile court was mandated to "hold a hearing to review the implementation of a permanency plan for each child in foster care within 10 months of the disposition hearing in which the CINA finding was made." Md.Code (1996, 1997 Cum.Supp.), § 3–826.1 of the Courts and Judicial Proceedings Article. It is of interest to note that the statute provided that if the child was to be "continued in placement for a specified period," then the court would have to determine "the extent of compliance with the permanency plan." § 3–826.1(d). The subsequent amendment to § 3–826.1, see ch. 539, Laws of 1998, to make it conform with the Federal Adoption and Safe Families Act of 1997 effected a significant change. Now, the court has the responsibility for determining the permanency plan, § 3–826.1(a)(1) and justifying the placement of children in out of home placements for a specified period or on long-term or permanency basis, § 3–826.1(d), in addition to conducting periodic, six month reviews. § 3–826.1(f).

*In re Damon M.,* 362 Md. at 430–31 n. 1, 765 A.2d at 624–25 n. 1. We disagree with Ms. B.'s interpretation of the meaning of the footnote.

The statutory changes that occurred in 1998 clarified the roles of the local department of social services and the court rather than substantively changed them. The local department of social services remains responsible for drafting a permanency plan for a child in out-of-home placement, and the court, despite any perceived implication in *In re Damon M.* to the contrary, always made the final decision as to the appropriate plan for the child. The roles of the local departments of social services and the juvenile courts have not changed due to this legislation. Therefore, we conclude that permanency

planning hearings are properly characterized as disposition review hearings under Rule 11–115d., and as such, "the court may, in the interest of justice, decline to require strict application" of the Rules of Evidence "other than those relating to the competency of witnesses," [19] Md. Rule 5–101(c), as the trial judge did in the present case.[20]

### Exclusion of the General Public Under Section 3–810 of the Courts and Judicial Proceedings Article

■ In 2001, the General Assembly enacted Maryland Code (1973, 2002 Repl.Vol.), Section 3–810 of the Courts and Judicial Proceedings Article, which provides in pertinent part:

(b) *Confidentiality; exclusion of general public.*—(1) In any proceeding in which a child is alleged to be in need of

---

19. This conclusion is consistent with a number of our sister jurisdictions which have considered this issue. *See, e.g., In the Matter of D.L., A.L.,* 603 S.E.2d 376, 382 (N.C.Ct.App.2004) ("Whenever the trial court is determining the best interest of a child, *any evidence* which is competent and relevant to a showing of the best interest of that child must be heard and considered by the trial court, subject to the discretionary powers of the trial court") (emphasis in original), quoting *In re Shue,* 311 N.C. 586, 319 S.E.2d 567, 574 (1984); Cal. Rules 1455(b) (2005) ("The court shall receive in evidence and consider the social study, a guardianship assessment, the report of any court-appointed child advocate, and any relevant evidence on its own motion"); La. Rule 10th Dist. Ct. 40.0 (2005) (stating that in juvenile permanency planning hearings hearsay evidence is admissible and acceptable; this rule is consistent throughout the district courts in Louisiana); Mich. Rule 3.976 (2005) ("The Michigan Rules of Evidence do not apply, other than those with respect to privileges, except to the extent such privileges are abrogated.... At the permanency planning hearing all relevant and material evidence, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value"); N.M. Rule 11–1101 (2005) (providing that the New Mexico Rules of Evidence do not apply to permanency planning hearings); N.C. GEN.STAT. § 7B–907 (b) (2004) ("The court may consider any evidence, including hearsay evidence as defined in [N.C. GEN.STAT. § 8C–1], Rule 801, that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition").

20. Because Ms. B only raised the issue of whether the Rules of Evidence should be strictly applied during permanency planning hearings and did not raise any question regarding the evidence introduced, we do not reach the hearsay issue.

assistance, the court may exclude the general public from a hearing and admit only those persons having a direct interest in the proceeding and their representatives.

(2) The court shall exclude the general public from a hearing where the proceedings involve discussion of confidential information from the child abuse and neglect report and record, or any information obtained from the child welfare agency concerning a child or family who is receiving Title IV–B child welfare services or Title IV–E foster care or adoption assistance.

Md.Code (1973, 2002 Repl.Vol.), § 3–810(b) of the Courts and Judicial Proceedings Article. According to the legislative history of the section, the General Assembly enacted subsection (b)(2) to comply with the provisions of the Child Abuse Prevention and Treatment Act ("CAPTA"), P.L. 93–247, 88 Stat. 4, codified as 42 U.S.C. § 5106a (2000). 2001 Md. Laws, Chap. 415. CAPTA requires states that receive federal grants to support their child welfare programs to enact

methods to preserve the confidentiality of all records in order to protect the rights of the child and of the child's parents or guardians, including requirements ensuring that reports and records made and maintained pursuant to the purposes of this subchapter ... shall only be made available to ... any Federal, State, or local government entity, or any agent of such entity, that has a need for such information in order to carry out its responsibilities under law to protect children from abuse or neglect.

42 U.S.C. § 5106a (b)(2)(A)(viii), (ix).

Ms. B. urges this Court to conclude that Ms. Traum, Ms. Duncan, and Mr. Mathews were members of the general public, and as such, should have been excluded from the proceedings in which confidential information from the child abuse report and record was discussed. We disagree.

All three individuals, Ms. Joanna Duncan, Ms. Josiane Traum, and Mr. Charley Mathews, were involved in the case at various stages of the process. Ms. Duncan, a Community Services Aide with the Department, observed Ms. B.'s visita-

tion with the children on several occasions and was privy to the information concerning the treatment of the children and their experiences while in the custody of Ms. B. Ms. Traum, a licensed social worker, was originally assigned to the children when they became involved with the Department, and therefore, also was aware of the confidential information concerning the child abuse. Mr. Mathews, a licensed social worker with the Sex Abuse Treatment division of the Department, supervised Ms. Atikkan, the children's current social worker, drafted a memorandum to the juvenile court discussing the children, and also had knowledge of the information at issue prior to the hearing. As such, each was an employee who had information regarding the status of the children and conceivably, could have needed information gleaned during the hearing.

The purpose of Section 3–810(b)(2) of the Courts and Judicial Proceedings Article, and CAPTA, is to prevent disclosure of confidential information concerning allegations and evidence of abuse that would impair the treatment and rehabilitation of the children and parents or guardians involved. Although we agree with Ms. B. that mere employment with the Department would not be sufficient to justify an employees presence during a hearing from which the general public must be excluded, we find no error in permitting employees of the Department who already knew of information concerning the child abuse in issue to remain during the hearing.

### Conclusion

Because we find that permanency planning hearings under Section 3–823 of the Courts and Judicial Proceedings Article and disposition review hearings under Maryland Rule 11–115d. are substantively identical, we conclude that the application of the Rules of Evidence is not mandatory during permanency planning hearings. Moreover, we hold that because department employees who were present during the hearing, had prior knowledge of and access to the confidential information contained in the child abuse report and record, they are

not properly considered members of the general public. Thus, the juvenile court did not err in failing to exclude them.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.*